CONNOR and WALKER, JJ., dissent.
Alfred Williams, for the State, testified that "Just before deceased came in prisoner was drinking, cursing, and talking. I was in there when deceased came in. When he came in he walked up to the stove and turned his back to it. Prisoner told Calicutt, the deceased, to put some coal in the stove. Deceased said, `I am not working here.' Prisoner told him again about the stove and fire. Deceased said he had no authority there. Prisoner said, `Damn you, you will do it, too.' Calicutt turned around. Prisoner caught him in the collar, shoved him back, and shot him between the eyes. When prisoner had deceased by the collar one of the men said, `Don't do that, Leish; quit.' Calicutt never said anything but what I have told. When the shot was fired, deceased fell. Prisoner dropped his pistol, picked it up, opened the door with both hands and went out. Calicutt went out on the platform. Nothing was said except what I have (676) told."
As to dying declarations of deceased, James Calicutt testified: "Deceased was my son. He lived eight days after he was shot between the eyes. He was conscious all the time. He told me when he came home that he was shot. He said every day he was going to die; asked me and his mother to pray for him. He said he had been to the festival; started home; went down to the railroad bridge with some others who were going to a wake at Morehead City (in this county). He got to the bridge and said he would not go further; went into the depot to see what time it was, and some one, he did not know who, asked him to make a fire in the stove. He told the man, `I don't work here.' The man said, `You've got to make it, for I am cold.' This fellow said, `Maybe you are not going to do it.' Deceased said, `No, for I don't work here.' The man said, `God damn you, I'll see if I can make you do it,' grabbed me (deceased) in the collar and shot me.' Deceased said he fell behind the door."
The prisoner, Elisha Garland, testified in his own behalf: "I laid down and dozed off to sleep. When deceased came in the door slammed and woke me. That was the time Ive Calicutt, deceased, came *Page 486 
in. I had not seen him before. Did not know him. I was lying where the partition between the seats was torn out, on my left side, asleep. Door slammed and I woke. I raised my head and laid down again. Cold chill ran over me. I looked and saw the darkey standing up near the stove with his back to it. I said, `Partner, wake that man and tell him to put some coal in the stove.' He said, I have nothing to do with waking him.' I said, `Can't you wake him and tell him to make a fire in the stove?' He turned his head to the left and said, `Who are you — a Mitchell County son of a bitch?' I said, `Don't you say that any more,' I jumped up and said, `You have got that to take back.' He said, `I don't say a damn thing to take (677) back.' I said, `There have been men who said things and took back.' He said, `You damn liar, you son of a bitch, I will shoot your head off.' Threw his right hand to his right hip, threw himself to the right and turned on his heel. I drew a revolver and fired. I fired when he threw himself around. His face was straight towards me. I dropped my pistol when I went to open the door, picked it up and went out the door and left. He was standing up on the south side and I walked up to him on the north side. I walked up from where I was lying at the stove, ten or twelve feet to where he was, and the shot was fired in two minutes."
On cross-examination prisoner testified: "I saw no firearms on the deceased. No gun or knife, no rock or stick. He never moved one step towards me. Saw no stick. Made no attempt to strike me. The Governor offered a reward for me. I was found in Mitchell County. I never heard Hollifield say, `Stop, Leish; don't do that.' I came over here to work. Did not bring my trunk or any clothes except what I wore. When I told him he had to take that back, then it was I walked up to where he was, at the side of the stove. I was indicted for marrying a woman through a joke. I have been in the U.S. Army; joined in 1902. I gave in my age as 18. 1 was not sworn as to my age. I was in the army fourteen months. The mock marriage took place in the woods. I was drunk once six or eight years ago."
The court among other things instructed the jury, after reciting all the evidence, that if they believed the prisoner's evidence and that of his witnesses to be true; he would at least be guilty of manslaughter, To the foregoing charge the prisoner in apt time excepted and assigned the same as error. This was the only exception as to the charge given.
The jury rendered a verdict of guilty of manslaughter, and (678) from the judgment thereon the prisoner appealed.
After stating the case: It is the law of this State that where a man provokes a fight by unlawfully assaulting another and in the progress of the fight kills his adversary, he will be guilty of manslaughter at least, though at the precise time of the homicide it was necessary for the original assailant to kill in order to save his own life. This is ordinarily true where a man unlawfully and willingly enters into a mutual combat with another and kills his adversary. In either case, in order to excuse the killing on the plea of self-defense, it is necessary for the accused to show that he "quitted the combat before the mortal wound was given, and retreated or fled as far as he could with safety, and then, urged by mere necessity, killed his adversary for the preservation of his own life." Foster's Crown Law, p. 276.
The same author says on page 277: "He, therefore, who, in case of a mutual conflict, would excuse himself on the plea of self-defense, must show that before the mortal stroke was given he had declined any further combat and retreated as far as he could with safety, and also that he killed his adversary through mere necessity and. to avoid immediate death. If he faileth in either of these circumstances he will incur the penalty of manslaughter." To the same effect is Lord Hale, who lays it down, "That if A assaults B first, and upon that assault B reassaults A, and that so fiercely that A cannat [cannot] retreat to the wall or other non ultra
without danger of his life, and then kills B, this shall not be interpreted to be se defendendo, but to be murder or simple homicide (manslaughter), according to the circumstances of the case; for, otherwise, we should have all the cases of murder or manslaughter, by way of interpretation, turned into se defendendo."
This principle was approved and applied in this State in S. v.Brittain, 89 N.C. 481. There it was held that when a prisoner makes an assault upon A and is reassaulted so fiercely that he cannot retreat without danger of his life, and the prisoner kills A, the killing cannot be justified on the ground of self-defense. The (679) first assailant does the first wrong and brings upon himself the necessity of slaying, and is therefore not entitled to the favorable interposition of the law. Applying this dictrine [doctrine] to the facts of this case, the Court is of opinion that no error has been committed.
According to the prisoner's own version of the occurrence, he was asleep in the waiting-room of the station and was waked up by the slamming of a door; feeling chilled, he said to the deceased: "Partner, wake that man up and tell him to put some coal in the stove," and the deceased replied: "I have nothing to do with waking him up." The prisoner replied, "Can't you wake him up and tell him to put some fire in the stove?" The deceased then used most insulting language towards the prisoner, and the prisoner jumped up and said, "You have *Page 488 
got to take that back," and advanced towards the deceased ten or twelve feet, when the deceased made a motion as if to draw a pistol, and the prisoner fired and killed him. On cross-examination the prisoner said, "I saw no firearms on the deceased, no gun, no knife, no rock or stick. He never moved one step towards me, and made no attempt to strike me. . . ."
A fair and correct interpretation of this testimony puts the prisoner in the wrong at the commencement of the difficulty. Although he may have been grievously insulted, yet, in going up to the deceased, having advanced ten or twelve steps and saying, "You've got to take that back," the prisoner unlawfully brought on the affray, and under the authorities cited the position of self-defense is not open to him, unless he can show that he quitted the combat before the mortal blow was given. In telling the jury that on the prisoner's own statement, if believed, he was guilty of manslaughter, there was no error, and it is so adjudged.
No error.