### STATE v. N. DeMAI.

(Filed 24 September, 1947.)

**1. Homicide § 18: Criminal Law §§ 34a, 81c (3)—**

While testimony of a declaration of a deceased made prior to the fatal encounter as to his reason for going to a place near the scene where the altercation took place is incompetent because not a part of the *res gestæ,* the admission of testimony of such declaration cannot be held prejudicial when there is no evidence that deceased knew of the proximity of defendant and no evidence that deceased went to the scene for other than some lawful purpose.

**2. Homicide § 17—**

The evidence tended to show that deceased's three sons and a nephew were with him at the time of the fatal encounter with the defendant. *Held:* Testimony of one of the sons that he went to the scene to keep deceased from getting into trouble with defendant is competent to negative the suggestion, arising on defendant's evidence, that the witness went to the scene to attack defendant.

**3. Criminal Law § 31h—**

A witness who has seen foreign service in the U. S. Army and who has been an Army instructor in small arms is competent to testify as to the caliber and range of the rifle used in the perpetration of the killing.

**4. Same—**

Where, after testimony qualifying a witness as an expert, the court admits expert testimony of the witness, it will be presumed that the court found the witness to be an expert notwithstanding the absence of a specific announcement of the preliminary ruling.

**5. Homicide § 25—**

Where the State's evidence tends to show an intentional killing by defendant with a deadly weapon, and defendant relies upon evidence of self-defense, defendant's motion to nonsuit is properly overruled.

**6. Criminal Law § 81c (5): Homicide § 30—**

Where defendant is convicted of murder in the second degree, any error in the instructions of the court relating to murder in the first degree cannot be held prejudicial in the absence of a showing that the verdict of second degree murder was thereby affected.

**7. Criminal Law § 53k—**

The language used by the court in stating the respective contentions of defendant and the State will not be held for prejudicial error when the expressions used by the court are based on the evidence and legitimate deductions therefrom.

**8. Same: Criminal Law § 53f—**

Defendant's assignment of error on the ground that the court consumed more time in stating the contentions of the State than those of defendant cannot be sustained when defendant does not complain that any of his contentions were omitted or incorrectly stated.

**9. Criminal Law § 53k—**

Defendant testified he was born in the United States but on cross-examination admitted that he had registered as an alien in 1940 under the Alien Registration Act, and stated without objection that his reason for so doing was some doubt as to which side of the international boundary line he was born on, and that he did not want to risk deportation. *Held:* The court's statement of the State's contention to the effect that the registration under the Alien Registration Act was not in good faith but to obtain advantages which might accrue from registering thereunder, with a further instruction that the whole matter was irrelevant but that the jury might consider it only upon the question of the credibility of the witness, is without prejudicial error.

**10. Homicide § 27f—**

While an instruction upon the perfect right of self-defense which is predicated upon a felonious assault being made on defendant, must be held for prejudicial error, nothing else appearing, where the court proceeds further and explains the principle of law applicable to non-felonious assault under the evidence presented in the case by instructing the jury that if the jury were satisfied that deceased and others with guns threatened defendant and approached close enough to inflict serious injury, even though a gun was not pointed at defendant, that would constitute an assault, the charge will not be held for reversible error.

**11. Same—**

Where the State's evidence, though contradicted by that of defendant, tends to show that defendant was at fault in bringing on the controversy in that he was armed with a high-powered automatic rifle, asserted his intention of immediately killing deceased, which caused deceased to desist from going where he had a right to go and to send for his gun to withstand defendant's present menace of violence, and that thereafter defendant opened the engagement and shot and killed his unarmed adversary, *is held* to warrant an instruction upon the duty of defendant to withdraw

from the difficulty before he could avail himself of plea of self-defense. Defendant's evidence to the contrary and his contention that he had made out complete self-defense were called to the attention of the jury.

APPEAL by defendant from *Hamilton, Special Judge,* at June Term, 1947, of NASH.   No error.

The defendant was indicted for the murder of Charlie A. Johnson. On the trial the State's evidence tended to show that the defendant intentionally shot the deceased with a rifle, killing him instantly.   It was contended on behalf of the defendant that the evidence warranted the conclusion that the killing was done in self-defense.

The circumstances of the homicide, according to the evidence offered by the State, were these:  Both defendant and the deceased lived south of the highway between Rocky Mount and Nashville, the defendant's land fronting on the highway and the land of deceased lying south and west of the defendant's.   The home of the deceased was some three-quarters of a mile from the highway, and reached by a road therefrom known as the Winstead Road.   His family consisted of his wife, three sons aged 19, 17, and 16 years, and a nephew, Jimmie Johnson, aged 26.   As the result of a dispute over the location of the dividing line between the lands of defendant and those of the deceased ill-feeling had arisen between them, and defendant had threatened the life of deceased.

Late in the afternoon of 26 April, 1947, the defendant appears to have taken possession of the disputed land and had his servant plowing thereon while he kept guard, armed with an automatic magazine rifle, 25-20 caliber.   The deceased who seems to have been unaware of the action of the defendant had driven in his car to a store on the highway to get an afternoon paper.   While he was gone one of his sons looking across the open space from his home (about a quarter of a mile) saw the defendant with his rifle, and he and his two brothers got in another car, and drove out to warn their father of the defendant's proximity.   But before they met their father, they saw him turn to his left off the Winstead Road and into a farm path which led to his tenant house 250 yards from the road, and in the direction of the field where the defendant was.   The deceased was unarmed, and could not have seen the defendant on account of woods and houses when he turned into the farm path to the tenant house, nor until he walked out beyond the tenant house into an open field.   When the three sons, all unarmed, arrived on the scene the deceased was talking to the defendant who was standing some 50 yards away with the rifle in his hand.   They heard defendant say he would kill the deceased if he came out there, and then declared he was going to kill him anyway.   The defendant appeared to be excited and angry.   The deceased seemed to have been in a good humor, as he laughed, waved his hand, and said he was unarmed, but if defendant was going to kill him

anyway he might as well get his gun, and told one of his sons to go to the house and get his gun. The son got in one of the cars, drove to the house where Jimmie Johnson, his nephew, joined him, and returned with a pistol, a shotgun and a .22 caliber rifle. When these reached the scene the defendant was still in the field with his rifle, and the deceased was standing in the open space near the tenant house smoking a cigarette. The other boys came to the car and took or were handed the .22 rifle and shotgun, Jimmie Johnson keeping the pistol. At that time the deceased exclaimed, "Lookout, he is going to shoot," and the boys dropped to the ground. Defendant opened fire and fired several shots. Apparently one of the first struck the deceased in the forehead and he fell to the ground on his face. Defendant continued to fire, and the Johnson boys then began firing and advancing through the woods on their left. The defendant fired on them, slightly wounding Jimmie Johnson, and then turned and ran toward his house. The Johnson boys came back and found their father dead. The still burning cigarette lay near his outstretched fingers on the ground.

The defendant's evidence, on the other hand, tended to show that when his servant began plowing earlier that afternoon, someone shot at him from the woods, the bullet passing through his clothes. The servant left his mule in the field and ran to the house and told defendant who thereupon had warrant sworn out against the deceased and one of his sons. The defendant then took his rifle and went to the field to protect his premises and his property from further attack. Shortly thereafter the deceased and his sons and nephew appeared near the tenant house, all armed with guns and rifles, and defendant retreated. The attackers deployed their forces on his right and left as if to surround him, and began firing at him from all sides. He fired several shots in return, and having used up the few cartridges he had, ran. He stoutly maintained he did not shoot at the deceased, and declared it could not have been a bullet from his rifle that killed him.

However, the State offered the bullet taken from the skull of the deceased and a ballistics expert from the F. B. I. who testified the fatal bullet was 25-20 caliber, and that from his examination of bullet and rifle in his opinion the bullet came from the defendant's rifle. Another witness, a former lieutenant of Marines who had served overseas during the war and had been for some time an instructor in firearms, testified the 25-20 rifle had greater range than the .22 rifle; that the shotgun would not be effective beyond 50 yards, and that the pistol had a maximum range of 75 yards. There was evidence from a number of witnesses that the defendant was a man of good character, and *contra* from State's witnesses that his character was bad.

There was verdict of guilty of murder in the second degree, and from judgment imposing prison sentence the defendant appealed.

*Attorney-General McMullan and Assistant Attorneys-General Bruton, Rhodes, and Moody for the State.*

*O. B. Moss, Thorp & Thorp, and J. A. Jones for defendant.*

DEVIN, J.   The trial of this case necessarily consumed considerable time.   Seventy-five witnesses were examined, forty-five for the State and thirty for defendant.   The transcript of their testimony fills 180 pages of the record, and the judge's charge to the jury covered 56 pages.   The industry and zeal of defendant's counsel are reflected in the 187 exceptions noted at the trial, 108 of them relating to the judge's charge.   Certainly no stone has been left unturned which might disclose error.   Under the ordinary limits of an opinion it will be inexpedient to discuss all of the exceptions brought up in defendant's appeal, but each has been examined and none overlooked.

The defendant assigns error in the admission over objection of testimony from witness John Johnson to the effect that he knew deceased went to the tenant house on the afternoon of the homicide to check fertilizer as witness had heard him speak of it, and that witness had himself gone there to keep deceased from getting into trouble with the defendant.   While the declaration of a deceased person not part of the *res gestæ* would ordinarily be regarded as incompetent, here the admission of the testimony objected to was harmless, as there was no evidence that deceased knew of the proximity of the defendant when he went to the tenant house or that he went for other than some lawful purpose. Likewise, it was competent for this witness to negative the suggestion that he himself went there to attack the defendant.   He testified both he and the deceased were unarmed.

The evidence of witness Jimmie Johnson as to the caliber and range of the weapons exhibited was competent, as the witness was shown to have had peculiar knowledge and experience as to such matters from service in the late war in the U. S. Marine Corps, where he was for some time instructor in the use of firearms.   While the court did not specifically announce preliminary ruling that he was an expert, by admitting his testimony the court presumably so found.   *S. v. Coal Co.,* 210 N. C., 742 (752), 188 S. E., 412.   The exception to the testimony of the ballistics expert from the F. B. I. is without merit.   Nor can the exception to the testimony of a character witness be sustained.   It was for the jury to determine how much weight should be given the testimony.

Defendant's motion for nonsuit was properly overruled.   *S. v. Johnson,* 184 N. C., 637, 113 S. E., 617.

The defendant noted exception to the court's instructions to the jury as to murder in the first degree. However, as the jury acquitted the defendant of the capital felony and found him guilty only of a lesser offense, any errors committed by the court in his charge on this phase of the case were cured by the verdict, and would not afford ground for a new trial in the absence of showing that the verdict of second degree murder was thereby affected.

The defendant has also brought forward in his assignment of error numerous exceptions taken by him to the court's instructions to the jury as to murder in the second degree, manslaughter, and the defendant's right of self-defense, but an examination of the entire charge in the light of the criticisms thus presented leaves us unconvinced that any prejudicial error was committed by the trial judge in the respects called to our attention. The established principles of law applicable thereto seem to have been stated in substantial accord with the decisions of this Court. While the court in charging the jury used at times somewhat colorful expressions in stating the contentions of the State and defendant, these expressions seem to have been based on evidence and legitimate deductions therefrom, and we cannot see that consequent harm resulted to the defendant.

The defendant assigns error in that the court's statement of the State's contentions consumed more space than that given the defendant's contentions. We perceive no prejudicial error on that score. He does not complain that any of his contentions were omitted or incorrectly stated. It had been agreed that the court need not recite the evidence in detail otherwise than in stating the contentions of the parties on the evidence.

The defendant excepted to the court's reference to a matter brought out on cross-examination of the defendant for the purpose of impeachment (S. v. Wilson, 217 N. C., 123 (127), 7 S. E. (2d), 11.). The defendant testified he was born in North Dakota, but later on cross-examination admitted that in October, 1940, he registered under the Alien Registration Act as an alien. He stated as his reason for so doing that he was born near the line between North Dakota and Canada, and was not sure on which side of the line he was born, and that he reasoned if it should be shown he was born north of the line without having so registered he might be deported. He testified he left his birthplace at the age of eleven, moved to Ohio, and came to Rocky Mount in 1909. No exception to this evidence was noted. In charging the jury the court stated at some length the defendant's contention on this point and recapitulated his testimony as to why he had registered as an alien in 1940. The court then in a single sentence stated the State's contention that one who knew that his birthright was that of the United States would not seek to appear as an alien, and that as certain advantages might accrue

from registering under the Alien Registration Act, the State contended the registration was not in good faith on the part of the defendant. The court then instructed the jury as follows: "The court instructs you that whether he registered or didn't register, whether he was born in Canada, North Dakota, North Carolina, or some island in the far seas, would have nothing at all to do with what happened on that field the late afternoon of 26 April, but you are allowed to consider those facts in respect to the registration only as you may relate the whole thing to the credibility of the witness as the witness has testified from the stand, and nothing else." We see no valid ground of complaint as to the court's action. The defendant's exception to the court's definition of malice and reference to how it may be shown is without merit.

The defendant excepted to the court's instructions to the jury on the defendant's right of self-defense under the various phases of the evidence. While the court's manner of statement might not be altogether unobjectionable, we think in the main he stated the law correctly, and we perceive no sufficient basis for awarding a new trial on that ground. The court laid down the rule in substance that if the jury should find the defendant was threatened with violence by the deceased and his sons, with present ability to inflict serious harm or death, while the defendant was at a place where he had a right to be and without fault in provoking the assault, and they found under these circumstances that he intentionally shot and killed the deceased, and they should further find that at the time he was acting under the reasonable apprehension that it was necessary or apparently necessary for him to do so in order to save himself from death or great bodily harm, and he used no more force than was reasonably necessary for that purpose, the law would excuse his act as having been done in self-defense and the jury should acquit. And the court further instructed the jury that they were to judge of the reasonableness of the apprehension under which he acted, but they must do so in the light of the circumstances as they appeared to the defendant at the time. True the court in stating the principle that one who was where he had a right to be and was without fault in bringing on the difficulty had a right to stand his ground and give back blow for blow, apparently predicated that right upon showing that a felonious assault was being made upon him. Standing alone this would have been error, as pointed out in *S. v. Bryant,* 213 N. C., 752, 197 S. E., 530; *S. v. Moore,* 214 N. C., 658, 200 S. E., 427; *S. v. Ellerbe,* 223 N. C., 770, 28 S. E. (2d), 519, on the ground that this instruction was calculated to give the jury the impression that before one could successfully plead self-defense he must show that a felonious assault was being made upon him, and that it was the duty of the court to go further and state the principle of law applicable to non-felonious assault, or draw the distinction between them.

*S. v. Hough,* 138 N. C., 663, 50 S. E., 709; *S. v. Blevins,* 138 N. C., 668, 50 S. E., 763. But here the court proceeded further to explain to the jury what would constitute an assault, under the evidence presented in this case, which would be sufficient to give rise to this right, and justify the defendant in standing his ground and shooting it out if apparently necessary to save himself from death or great bodily harm; and the court instructed the jury if they were satisfied the deceased and others approached with guns threatening him and close enough to inflict serious injury, even though a gun was not pointed at him, that would constitute an assault. We do not think the defendant can justly complain of the court's instruction on this phase of the evidence. *S. v. Glenn,* 198 N. C., 79, 150 S. E., 663; *S. v. Pennell,* 224 N. C., 622, 31 S. E. (2d), 857.

The defendant excepted to the court's instructions as to the imperfect right of self-defense as applicable to this case. The court charged the jury in substance that where one was without fault in provoking the difficulty he had a right to stand his ground on his own land and return blow for blow without withdrawing and slay his assailant if necessary or apparently necessary to save himself from death or great bodily harm, but that if the jury found the defendant was at fault in bringing on the difficulty by using language calculated and intended to bring on the difficulty which ensued, and provoked an assault by threats and menace of violence with present ability to inflict it, causing the deceased to do something he otherwise would not have done, and that the defendant thus became the aggressor, then the defendant would not be entitled to avail himself of plea of self-defense in a situation he had wrongfully brought about until he first tried to withdraw from the difficulty and gave his adversary notice of his intention so to do, and then through mere necessity and to avoid death or great bodily harm fired the fatal shot. *S. v. Garland,* 138 N. C., 675, 50 S. E., 853; *S. v. Kennedy,* 169 N. C., 326, 85 S. E., 42; *S. v. Crisp,* 170 N. C., 785, 87 S. E., 511; *S. v. Glenn, supra; S. v. Robinson,* 213 N. C., 273, 195 S. E., 824. However, we think, taking the testimony offered by the State in its most favorable light, there was some evidence upon which to base the instruction complained of. According to the State's witnesses, the defendant, with a high-powered automatic rifle in his hand and within range, asserted his intention of immediately killing the deceased, which caused the latter to desist from going where he had the right to go, and to send for his gun to withstand this present menace of violence. The State's evidence further tended to show that the defendant opened the engagement, began firing and shot and killed his unarmed adversary. The defendant's contention that these were not the facts and his version of the circumstance and cause of the shooting, making out a case of complete self-defense, were fully called to the attention of the jury.

The testimony in the case offered by the State and that by defendant were sharply contradictory at every material point. While the defendant earnestly contended the evidence warranted a verdict of acquittal on the ground of self-defense, the jury has accepted the State's version of what happened on this fatal field, and found the defendant guilty of murder in the second degree. There was evidence to support this finding. No prejudicial error appears on the record, and the result will be upheld.

No error.