STATE OF NORTH CAROLINA v. ALLAN THOMAS LASSITER

No. COA02-1279

(Filed 7 October 2003)

## 1. Evidence— relevance—bullet hole in mobile home—victim's cause of death uncertain

The admission of evidence about a bullet hole in defendant's mobile home was not an abuse of discretion in a first-degree murder prosecution (with a voluntary manslaughter verdict) where the victim's cause of death could not be determined. Although there was evidence that she had suffered blunt force trauma to her head, this did not preclude the possibility that she was shot. Moreover, the admission of this evidence was not prejudicial even if erroneous because it was but a small piece of a large circumstantial puzzle.

## 2. Evidence— expert testimony—dwelling fire not caused by grease

The admission of testimony that a fire at defendant's mobile home could not have been caused by grease as defendant contended was admissible in a prosecution for first-degree murder and setting fire to a dwelling house. The witness was a qualified expert, and his testimony was not limited to enlightening the jury about everyday grease fires, but concerned the reasons this was not an everyday grease fire.

**3. Homicide— voluntary manslaughter—provocation—sufficiency of evidence**

The trial court correctly denied defendant's motion to dismiss a voluntary manslaughter charge where there was sufficient evidence of an intentional killing with provocation. A jury could reasonably infer that the victim rebuffed defendant's desire for a more intimate relationship, provoking a passionate response in defendant and leading to voluntary manslaughter.

**4. Homicide— voluntary manslaughter—defendant as perpetrator—sufficiency of evidence**

There was sufficient evidence in a first-degree murder prosecution (with a manslaughter verdict) that defendant was the last person in the presence of the victim and thus the perpetrator of her intentional killing.

**5. Arson— burning dwelling for fraudulent purposes—concealing evidence of killing**

There was sufficient evidence that defendant had burned his dwelling for fraudulent purposes where there was substantial evidence that defendant intentionally burned his mobile home and substantial evidence of his guilt of voluntary manslaughter. A jury could reasonably infer that defendant sought to suppress the truth and deliberately deceive law enforcement in the investigation of the death by setting fire to his dwelling.

**6. Homicide— alleged error in first-degree murder instruction—manslaughter conviction**

There was no plain error in a first-degree murder instruction on premeditation and deliberation where defendant was convicted for voluntary manslaughter. Premeditation and deliberation are not elements of voluntary manslaughter.

**7. Arson— instruction—concealing evidence of homicide—fraudulent purpose**

The trial court did not err by instructing the jury that concealing evidence of a homicide was a fraudulent purpose under N.C.G.S. § 14-65.

Appeal by defendant from judgments entered 8 October 2001 by Judge Henry W. Hight, Jr., in Vance County Superior Court. Heard in the Court of Appeals 20 August 2003.

*Attorney General Roy Cooper, by Assistant Attorney General Susan R. Lundberg, for the State.*

*Daniel F. Read for defendant appellant.*

McCULLOUGH, Judge.

Defendant Allan Thomas Lassiter was tried before a jury in the Criminal Session of the Vance County Superior Court. Defendant was charged with one count of first-degree murder, one count of occupant or owner setting fire to a dwelling house, and two counts of burning personal property. The trial commenced on 17 September 2001. On 8 October 2001, the jury found the defendant guilty of voluntary manslaughter and fraudulently setting fire to and burning a dwelling house; and not guilty of the two counts of burning personal property.

The State's evidence tended to show the following: Angela Griffin ("Angela"), Sharon Keeling ("Keeling"), Troy Stainback ("Stainback"), and defendant, were all friends. As of the week of 11 October 1999, the intricacies of the relationships among these four individuals were as follows: Angela and defendant had been friends since 1992, and shared a close relationship where defendant sometimes stayed overnight at Angela's house in her bedroom. Stainback and Angela had an off-and-on intimate relationship and Stainback was the father of Angela's son Logan. Angela had moved back to her parents' from Stainback's, but during the week of 11 October 1999 she was again spending some nights at his house. Keeling and defendant had been involved in an intimate relationship which ended in September of 1999, and defendant was the father of Keeling's daughter Jessica. Keeling and Angela were best friends and coworkers at a restaurant, the Wildflower Cafe.

The State offered testimony setting forth the defendant's repeated tactic of winning the affections of women already involved in a relationship by telling these women that their current partner was cheating on them. Tammy Stokes ("Stokes"), a State's witness, testified that while she and defendant were both married, they engaged in an illicit affair. Stokes also testified that defendant told her that her husband was continuously cheating on her. In early October of 1999, defendant arranged for Stainback, Angela's off-and-on boyfriend, to go out with Lisa Rhodes. Stainback and Rhodes did go out together.

The week of 11 October 1999, defendant made numerous phone calls to the Wildflower Cafe, Stainback's house, and Angela's parent's

house. On 11 October 1999, defendant called the Wildflower Cafe twice and talked with someone other than Keeling. Keeling testified that defendant had never called her at work, nor had he ever come to visit her there. Angela received a phone call at the Wildflower Cafe on the morning of 11 October 1999. Later that day or later that week, as a result of this phone call, Angela and Keeling went to the residence of Stainback to spy on him from the woods. They were looking for a girl who was supposed to have been there with Stainback.

Angela was last seen alive on the evening of 15 October 1999. She worked at the Wildflower Cafe that morning and early afternoon. While she was working, defendant and Shane Farrar ("Farrar") ate lunch at the Wildflower and talked with Angela. Later that afternoon, Angela went to Keeling's house and left her son with Keeling so that she could go out and find Stainback. Angela told Keeling that she would be back in an hour. Keeling never saw Angela again.

Around 6:00 p.m., Angela called Everett Grissom's ("Grissom") house twice looking for Stainback. While Angela refused to give Grissom her location so that he could have Stainback call her back, phone records indicate that Angela was calling from defendant's mobile home phone number. The times of these calls match both Grissom's phone records and defendant's. Angela spoke to Stainback during the second call. Stainback and Grissom then went to Wilmington, North Carolina for the weekend.

From 6:29 p.m. on 15 October 1999, until 12:36 a.m. on the morning of 16 October 1999, a number of people called defendant's mobile home phone number, but defendant never answered the phone. Defendant had plans to go to a party with Farrar that night, but Farrar was one of those unable to reach him. During the time defendant was unreachable as to incoming calls, defendant called Keeling's house from 7:49 p.m. on into the night, approximately eight times. Each call was a short conversation between Keeling and defendant. Keeling testified that during one of the these conversations, defendant told her he had gone to Middleburg to dine at the Middleburg Steakhouse, but that he had been unable to because the steakhouse was closed that Friday. When asked where he was the evening of 15 October 1999, defendant gave the following responses: to Investigator J.M. Cordell of the Vance County Sheriff's Department, he said he had been with Melanie Carlile ("Carlile"), Jennifer Hobgood ("Hobgood") and Mark Sizemore ("Sizemore") at Joker's Pool Room commencing between 10:00 p.m. and 12:00 a.m. until 2:00 a.m. on 16 October 1999. To his landlady, defendant said that he was hanging drywall. To

Angela's mother, defendant said that he had planned on spending the night with Angela, Keeling, and their kids at Stainback's house. Evidence was also presented that defendant offered to pay a friend any amount of money to verify that he was with defendant the night that Angela disappeared.

Defendant had known Carlile for three months, and their relationship had turned intimate about a week before 15 October 1999. At 1:12 a.m. on 16 October 1999, Carlile called and spoke with defendant from Joker's Pool Room. Carlile had tried reaching defendant thirteen times at his mobile home, but defendant was unreachable until the 1:12 a.m. call. Carlile testified that defendant was hesitant to come to the Joker, stating that he said he "was dirty and didn't feel like going nowhere." At about 1:30 a.m., defendant met up with Carlile, Hobgood, and Sizemore. Carlile first made a statement that defendant arrived in ragged clothing, but then later testified that he was wearing a new outfit. Hobgood testified that defendant arrived at Joker's in worn clothing with dirt on his pants. They stayed at the bar shooting pool until closing, 2:00 a.m., and then all returned to Carlile's father's house. Defendant stayed at Carlile's house until approximately 7:30 a.m. on 16 October 1999. It was the first night he had spent with Carlile.

On the morning of 16 October 1999, shortly after defendant had returned to his mobile home, there was a fire in the home's interior. Defendant claimed the cause was hot grease used in preparation of Tater Tots. He claims he went to the door of the mobile home to throw them out, but the wind blew it back in on him and that was how the fire started. Defendant had no observable injuries or burns from the fire, and made no complaint of injuries or burns on the day of the fire.

Based solely on what defendant told the firefighters the day of the fire, the Vance County Fire Lieutenant's report of the fire listed its source as a pan of grease. The State's arson and fire expert witness, Agent David Campbell ("Agent Campbell"), testified that it was physically impossible for defendant's mobile home fire to have been caused by ignited vegetable oil/grease being spilled on the carpet. Agent Campbell testified that in his opinion the fire was intentionally set by someone pouring a large quantity of an ignitable liquid in the living room area and setting it on fire. This was based in part on Agent Campbell's finding of hydrocarbon sooting on the inside of the mobile home windows suggesting a hydrocarbon fuel was the source of the fire. Vegetable oil, alleged by defendant to be

the source of the fire, is not a hydrocarbon and would not leave a hydrocarbon sooting.

Also on the morning of 16 October 1999, a hole that looked like a bullet hole was observed in the front side of the mobile home under the front windows in the area where the most intensive burning had occurred. The owners of the mobile home testified that this "bullet" hole was not in the mobile home when they rented it to defendant, nor did they believe it to have been present until the morning of the fire on 16 October 1999. S.B.I. agent and crime scene specialist Al Langley ("Agent Langley") examined the mobile home and determined that the hole in the front of the mobile home was a .22 caliber bullet hole fired from the inside of the mobile home.

At about 8:00 a.m. on the morning of 16 October 1999, Keeling called Angela's mother Diane Griffin ("Diane"), and told her that Angela had not returned to pick up Logan. During the day of 16 October 1999, Diane tried to locate Angela, but could not. Around 5:00 p.m. on that same day, Diane called the Vance County Sheriff's Department and reported Angela missing.

Later that day, Angela's car was found parked at the Middleburg Variety Store in Middleburg. The driver's seat was pushed back against the backseat, indicating that the person who had driven the car to the Middleburg Variety Store was a person much taller than Angela. Angela was about five feet two inches while defendant is about six feet four inches.

In early February 2000, Angela's skull and other skeletal remains were found in a field and wooded area just off Brookstone Road and Currin Road. A "shallow grave" near Angela's remains had been dug some several months prior to the discovery of the remains. Defendant lived nine-tenths of a mile from the "shallow grave" and the location of Angela's remains. The condition of Angela's remains were consistent with her having been dead since October of 1999. Angela's skull showed numerous fractures on the left, right, and back sides. The State's medical expert witness determined that these fractures were blunt force injuries that were the likely cause of Angela's death.

The interior of the mobile home, the carpeting, and other furnishings that had been in the mobile home at the time of the fire, were tested for traces of blood. These tests were inconclusive. Agent Susan Barker ("Agent Barker") confirmed that extreme heat can destroy blood, and a fire can prevent detectives from finding evidence of blood.

The jury found the defendant guilty of (1) voluntary manslaughter of Angela Griffin and (2) fraudulently setting fire to and burning a dwelling house; and not guilty of the two counts of burning personal property. The trial court determined defendant had a prior record level of II. He was therefore sentenced to consecutive terms of 77 to 102 months for the offense of voluntary manslaughter, and 8 to 10 months for the offense of fraudulently setting fire to and burning a dwelling house. Defendant entered notice of appeal of the judgment against him on 8 October 2001.

On appeal, defendant argues the trial court erred by (I) allowing the introduction of testimony regarding an alleged .22 caliber bullet hole in the front side of defendant's mobile home; (II) allowing expert testimony that it was physically impossible for grease to have caused the fire in the mobile home; (III) denying defendant's motion to dismiss on grounds of sufficiency of the evidence; (IV) instructing the jury that premeditation and deliberation can be inferred from evidence of how a defendant handles a victim's body; and (V) instructing the jury that concealing evidence relating to the death of Angela Griffin was a fraudulent purpose pursuant to N.C. Gen. Stat. § 14-65 (2001). For the reasons set forth herein, we are not persuaded by defendant's arguments and conclude he received a trial free from reversible error.

## I. The .22 Caliber Bullet Hole

[1] By his first assignment of error, defendant contends the trial court erred by allowing testimony regarding an alleged .22 caliber bullet hole in the front side of defendant's mobile home. Because there was no evidence that Angela's death was caused by a gunshot, no evidence that anyone heard a shot, and no evidence that defendant had a .22 caliber rifle, defendant argues the bullet hole evidence is irrelevant.

The scope of relevant evidence in North Carolina is as follows: Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C. Gen. Stat. § 8C-1, Rule 401 (2001). Generally, all relevant evidence is admissible. N.C. Gen. Stat. § 8C-1, Rule 402 (2001). The North Carolina Supreme Court has consistently stated that in a criminal case every circumstance calculated to throw any light upon the supposed crime is admissible and permissible. *State v. Arnold*, 284 N.C. 41, 47, 199 S.E.2d 423, 427 (1973); *see also State v. Riddick*, 316

N.C. 127, 137, 340 S.E.2d 422, 428 (1986); *State v. Collins*, 335 N.C. 729, 735, 440 S.E.2d 559, 562 (1994).

Defendant was charged with the murder of Angela Griffin. The State's evidence did establish that Angela had been intentionally killed, though the exact cause of death could not be determined. From the examination of her skull, a likely cause of death was blunt force traumas to her head. However, in light of other relevant facts circumstantial to the bullet hole, the traumas to her head do not preclude the possibility that Angela may have also been shot at but not struck, shot and wounded, or even shot and killed.

On 8 November 1999, Agent Langley determined by physical examination and chemical testing that the hole in the front side of the mobile home rented and occupied by defendant was a .22 caliber bullet hole. Agent Langley also determined that the bullet had been fired from inside the mobile home to the outside. The bullet was never found.

Testimony established that defendant had a rifle or shotgun in the living room of the mobile home on the morning of 16 October 1999. Furthermore, it was undisputed that there was what appeared to be a bullet hole in the front side of the mobile home on 16 October 1999. It was also undisputed that when defendant rented the mobile home there was no bullet hole, and there were no reports of one thereafter until 16 October 1999.

While there was no evidence presented during the trial directly linking the .22 caliber bullet hole in the mobile home to the killing of Angela, the bullet hole was located at the deepest and heaviest burn area in the mobile home. This was below the windows. This fact supports the State's theory that the fire was intentionally set by defendant to cover up evidence pertaining to Angela's death. Evidence was presented at trial that extreme heat can destroy blood.

The trial court has discretion on admission of evidence. This Court will only disturb such discretion " 'unless it "is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." ' " *State v. Burgess*, 134 N.C. App. 632, 635, 518 S.E.2d 209, 211 (1999) (quoting *State v. McDonald*, 130 N.C. App. 263, 267, 502 S.E.2d 409, 413 (1998) (quoting *State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988))). In the instant case, the following facts support the trial judge's discretionary decision to admit evidence pertaining to the bullet hole: (1) the cause of

death of Angela cannot be conclusively established; (2) the defendant allegedly had a rifle or shotgun in his mobile home on the 16 October 1999; (3) testimony established the bullet hole was not known by or reported to the owner of defendant's mobile home before 16 October 1999; (4) testimony established the bullet had been fired from inside the mobile home to the outside; and (5) the location of the bullet hole on the inside of the mobile home was at the deepest and heaviest burn area. These facts establish that the trial court's decision to admit this evidence was not arbitrary.

Finally, had we found the trial court's decision to admit the bullet hole evidence was arbitrary, defendant still has the burden of showing that but for its admission, he would not have been convicted of voluntary manslaughter. We agree with the State that the bullet hole evidence was a rather small piece of evidence in this elaborate circumstantial case, and did not so prejudice defendant to establish that its admittance was more than harmless.

## II. Expert Testimony Regarding Fire Causation

[2] Defendant's second issue alleging error contends the trial court erred in allowing expert witness Agent Campbell to testify regarding the impossibility that grease could have caused the fire of 16 October 1999. Defendant argues that Agent Campbell's expert opinion was merely speculation. We do not agree.

Generally, "a witness as an expert may give testimony in the form of an opinion if his or her specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." *State v. Blakeney*, 352 N.C. 287, 311-12, 531 S.E.2d 799, 816-17 (2000), *cert. denied*, 531 U.S. 1117, 148 L. Ed. 2d 780 (2001); *State v. Eason*, 328 N.C. 409, 421-22, 402 S.E.2d 809, 815 (1991); *see* N.C. Gen. Stat. § 8C-1, Rule 702 (2001). "The expert may base such an opinion on information not otherwise admissible, so long as it is the type of information reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." *Eason*, 328 N.C. at 421, 402 S.E.2d at 815. Our Supreme Court has also held that a properly qualified arson expert may offer opinion testimony that fire was set intentionally. *State v. Hales*, 344 N.C. 419, 424-25, 474 S.E.2d 328, 330-31 (1996).

Agent Campbell testified that he has 40 years of experience with firefighting. His experience is comprised of over 3000 hours of fire department training and fire investigation training. Agent Campbell

STATE v. LASSITER

[160 N.C. App. 443 (2003)]

received his training from a large number of institutions and organizations recognized in the field of fire training and fire investigation, including the International Association of Arson Investigators, the North Carolina Fire Institute, and the North Carolina State Bureau of Investigation. This training includes learning fire chemistry behavior, fire cause and origin, and arson. Agent Campbell is also a level-three instructor in the field of fire and arson investigation who teaches numerous courses each year for institutes such as the International Association of Arson Investigators and the United States Bureau of Alcohol, Tobacco, and Firearms.

Agent Campbell was accepted without objection as an expert in the field of fire chemistry and behavior, fire cause and origin, and arson and fire investigation. Defendant objected to Agent Campbell's testimony that the fire was caused by a hydrocarbon source, and that it was physically impossible for grease to have started the fire because, as tested, the fire would go out when it hit the floor. Defendant believes that the jury could be trusted to form its own common sense conclusions about cooking fires and no assistance from an expert is permissible. We disagree.

Agent Campbell was a qualified expert whose testimony assisted the trier of fact as to the potential origin and cause of the fire in defendant's mobile home. His testimony was not limited to enlightening the jury as to how an everyday grease fire occurs, but expanded on why this was not an ordinary grease fire.

Agent Campbell's testimony revealed that the fire moved rapidly, and was fueled by a hydrocarbon, also know as a Class B fuel or material, which produced hydrocarbon soot inside the mobile home. A hydrocarbon is anything that comes from a fractional distillation process, such as gasoline, kerosene, paint thinner, and lighter fluid. Vegetable oil is not such a hydrocarbon, and would not leave any hydrocarbon soot on the interior windows of the mobile home. Furthermore, Agent Campbell testified as to the burn pattern of the fire. In the living room, there was no fire burned V-pattern. However, such a V-pattern was found on the hallway walls and the kitchen. Additionally, he testified that he found hydrocarbon soot patterns under the bottom of the trailer, which was also the location of the deepest burn areas. This reinforced all of the other findings that established that the fire did not start in a specific place, such as the stove, but rather over a large area. This is consistent with the pouring of a quantity of easily ignitable liquid over an area of the living room floor.

**STATE v. LASSITER**

[160 N.C. App. 443 (2003)]

Agent Campbell testified further that in his opinion it was physically impossible for the 16 October 1999 fire in defendant's mobile home to have been caused by grease. His testimony was based on an experiment he ran attempting to ignite Food Lion Vegetable Oil. After several failed attempts at igniting the hot oil, he finally did so using a plumber's (benzomatic) torch. He then poured the ignited oil onto the floor where the fire went out, leaving grease patterns on the floor. No traces of grease where found on defendant's living room carpet.

Agent Campbell was a qualified expert who testified as to the source and cause of the fire of 16 October 1999 in defendant's mobile home. His expert opinion that the source of this fire was a hydrocarbon fuel, that it was impossible for ignited vegetable oil to have been the source of the fire, and that the fuel was poured in a large quantity on the living room floor of the mobile home was properly admitted. This assignment of error is overruled.

### III. The Trial Court's Denial of Defendant's Motion to Dismiss

Defendant next contends that the trial court erred in denying his motion to dismiss at the close of the State's evidence and at the close of all of the evidence, claiming that the evidence was insufficient to support the charges. Defendant was charged with: (1) first degree murder; (2) fraudulently setting fire to dwelling houses under N.C. Gen. Stat. § 14-65 (2001); and (3) the burning of personal property under N.C. Gen. Stat. § 14-66 (2001). Defendant was found guilty of voluntary manslaughter and of fraudulently setting fire to dwelling houses under N.C. Gen. § 14-65 (2001).

In *State v. Fritsch*, 351 N.C. 373, 378-79, 526 S.E.2d 451, 455, *cert. denied*, 531 U.S. 890, 148 L. Ed. 2d 150 (2000), our Supreme Court reiterated the standard of review for motions to dismiss in criminal trials. The Court quoted *State v. Powell*, 299 N.C. 95, 261 S.E.2d 114 (1980):

> Upon defendant's motion for dismissal, the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense. If so, the motion is properly denied.
>
> If the evidence is sufficient only to raise a suspicion or conjecture as to either the commission of the offense or the iden-

tity of the defendant as the perpetrator of it, the motion should be allowed.

*Id.* at 98, 261 S.E.2d at 117 (citations omitted).

When circumstantial evidence is being used to establish the sufficiency of the evidence, we review the evidence supporting the convictions in accord with the following standards: In reviewing challenges to the sufficiency of evidence, "we must view the evidence in the light most favorable to the State, giving the State the benefit of all reasonable inferences." *State v. Benson*, 331 N.C. 537, 544, 417 S.E.2d 756, 761 (1992). Contradictions and discrepancies do not warrant dismissal of the case but are for the jury to resolve. The test for sufficiency of the evidence is the same whether the evidence is direct or circumstantial or both. *State v. Bullard*, 312 N.C. 129, 160, 322 S.E.2d 370, 388 (1984). "Circumstantial evidence may withstand a motion to dismiss and support a conviction even when the evidence does not rule out every hypothesis of innocence." *State v. Stone*, 323 N.C. 447, 452, 373 S.E.2d 430, 433 (1988).

If the evidence presented is circumstantial, the court must consider whether a reasonable inference of defendant's guilt may be drawn from the circumstances. Once the court decides that a reasonable inference of the defendant's guilt may be drawn from the circumstances, then " 'it is for the jury to decide whether the facts, taken singly or in combination, satisfy [it] beyond a reasonable doubt that the defendant is actually guilty.' " *State v. Thomas*, 296 N.C. 236, 244, 250 S.E.2d 204, 209 (1978) (alteration in original) (quoting *State v. Rowland*, 263 N.C. 353, 358, 139 S.E.2d 661, 665 (1965)).

### A. Voluntary Manslaughter

[3] Voluntary manslaughter is the unlawful killing of a human being without malice, express or implied, and without premeditation and deliberation. *State v. Jackson*, 145 N.C. App. 86, 91, 550 S.E.2d 225, 229 (2001). Voluntary manslaughter occurs when one kills intentionally, but does so in the heat of passion aroused by adequate provocation or in the exercise of self-defense where excessive force is used or defendant is the aggressor. *Id.* To survive a motion to dismiss a charge of voluntary manslaughter, the State must bring forth a quantum of evidence, viewed in their favor, that allows a reasonable inference that Angela was intentionally killed and that defendant was the perpetrator of the killing.

### 1. Intentional Killing and Adequate Provocation

In the instant case, there is uncontroverted evidence that the remains of Angela Griffin were found in February of 2000. The remains included her skull, skeletal remains, bones, and pieces of blond hair. The remains were found near a "shallow grave" in the area of Brookstone Road and Currin Road. The area where the remains were found was approximately nine-tenths of a mile from the defendant's mobile home. Evidence of record establishes that the condition of these remains is consistent with Angela having been dead since October of 1999. Angela was last seen alive on the afternoon of 15 October 1999.

Angela's skull had numerous fractures on the right, left, and back. The Chief Medical Examiner, Dr. John Butts ("Dr. Butts"), determined that these skull fractures were blunt force injuries caused by the head being struck with a heavy object at considerable velocity, or by the head being slammed against a hard surface. Dr. Butts also testified these fractures were probably the cause of Angela's death. Considering this evidence in the light most favorable to the State, we believe a reasonable jury could infer that Angela was intentionally killed on the night of 15 October 1999.

Furthermore, we believe the State put forth a sufficient quantum of evidence to survive a motion to dismiss, which, when viewed in their favor, substantially supports the reasonable inference by the jury that defendant could have had adequate provocation for the intentional killing of Angela the night of 15 October 1999. Evidence established that defendant had a history of breaking up intimate relationships by gaining the confidences of both partners. He did so by leading the man astray, and informing the woman that her man was cheating on her. Defendant's purpose was to then induce the woman to be intimate with him.

The State offered evidence that defendant was very close to Angela, and had spent the night at Angela's house and even in her room on a number of occasions. This occurred despite the fact that Angela had a long-term boyfriend, Stainback, with whom she had a child, and with whom defendant was friends. The State presented the testimony of Lisa Rhodes that defendant had arranged for her to go out with Stainback in October of 1999. Phone records establish that on 11 October 1999 defendant called the Wildflower Cafe, where Angela worked, during the morning hours. Keeling, defendant's ex-girlfriend, testified that she did not talk to defendant on 11 October

STATE v. LASSITER

[160 N.C. App. 443 (2003)]

1999 while at work at the Wildflower, but that Angela did take a call that morning. Evidence suggests that in reaction to this phone call, Angela went with Keeling to Stainback's house to spy on him. Throughout the week of 11 October 1999, phone records also indicate that defendant called Angela numerous times at work, at Stainback's house, and at her parents' home. Circumstantial evidence suggests also that Angela and Stainback's relationship was still regular, as Angela was spending more nights over at his home.

Viewing the above evidence in the light most favorable to the State, we believe the trial court did not err in allowing the jury to infer that defendant was seeking to break up Stainback's and Angela's relationship with the prospect of having a more intimate relationship with Angela. Circumstantial evidence suggests that defendant set Stainback up with Rhodes so that he could then tell Angela that Stainback was cheating on her. This evidence also shows that Angela took a call which led her to spy on Stainback to see if in fact he was cheating. From this evidence, we believe a jury could reasonably infer that Angela rebuffed defendant's desire to have a more intimate relationship with her, provoking a response of passion in defendant and leading to voluntary manslaughter.

## 2. Defendant as the Perpetrator of the Offense

[4] The State also provides a sufficient quantum of circumstantial evidence that defendant was the last person in the presence of Angela and thus the perpetrator of the intentional killing of Angela. Phone records establish that in the early evening of 15 October 1999, at 6:01 p.m. and 6:10 p.m., someone from defendant's phone number called Grissom's phone number. Grissom and Stainback were leaving together from Grissom's house to go to Wilmington for the weekend. Grissom testified that on that same day around 6:00 p.m., Angela called twice attempting to locate Stainback, and that Angela would not reveal her location to Grissom for the purposes of having Stainback call her back. Grissom also testified that at no time on 15 October 1999 did he talk to defendant on the phone.

Evidence shows that on the evening and night of 15 October 1999, defendant could not be reached by phone. He had made plans with Farrar, a friend with whom he had lunch that day at the Wildflower Cafe, to go to a party in Virginia. Defendant never answered Farrar's phone calls that evening regarding the party. Phone records show some thirteen calls were made by Carlile between 7:09 p.m. on 15 October 1999 and 12:36 a.m. on 16 October 1999, all unanswered.

Defendant did answer a call at 1:12 a.m. on 16 October 1999 from Carlile asking him to come to Joker's Pool Room. Carlile testified that defendant joined them at Joker's around 1:30 a.m. Carlile testified that defendant was reluctant to come because he said he was filthy and was washing his clothes. There is some conflicting testimony as to whether defendant was wearing disheveled clothing or a new outfit when he arrived at Joker's.

Keeling testified that defendant called her a number of times on the evening of 15 October 1999. During one of these calls, he told Keeling that he drove to Middleburg Steakhouse for dinner but that it was closed. Angela's car, found 16 October 1999 at the Middleburg Variety, had the driver's seat pushed all the way back against the backseat, indicating that the person driving the car was much taller than Angela. Angela was about five feet two inches while defendant is about six feet four inches.

Finally, the State provided evidence that defendant gave a number of conflicting statements concerning where he was the night of 15 October 1999 and tried to establish an alibi.

The evidence put forth by the State, viewed in the light most favorable to the State, is sufficient to support the inference that defendant was the perpetrator of the intentional killing of Angela. Therefore, we believe the trial court properly denied the motion to dismiss.

### B. Burning of a Dwelling for Fraudulent Purposes

**[5]** The elements for the charge of fraudulently burning a dwelling under N.C. Gen. Stat. § 14-65 are that the accused was the owner or occupier of a building that was used as a dwelling house and that the accused either set fire to, burned, or caused the dwelling to be burned wantonly and willfully or for fraudulent purposes. *State v. Payne*, 149 N.C. App. 421, 424, 561 S.E.2d 507, 509 (2002).

It is undisputed that defendant occupied the mobile home, used it as a dwelling, and was alone in the home at the time the fire commenced. Furthermore, the State has established substantial evidence that the fire was not caused accidentally, but started in the living room of the home from a hydrocarbon source.

Defendant claims that the facts of this case, under existing case law, preclude this Court from finding defendant set fire to the mobile home for a fraudulent purpose when that alleged purpose is to burn

evidence of guilt of another crime. We disagree and hold that there was substantial evidence from which a reasonable jury could infer defendant's setting fire to his mobile home was for a fraudulent purpose pursuant to N.C. Gen. Stat. § 14-65.

Defendant relies on *State v. White*, 288 N.C. 44, 215 S.E.2d 557 (1975), arguing that the burning of a dwelling house to conceal evidence is not a "fraudulent purpose" as intended by N.C. Gen. Stat. § 14-65. We disagree with defendant's preclusive reading of *White*. At issue in *White* was common law arson, where the defendant in that case attempted to burn the dwelling of another for purposes of intimidating the occupant, a State's witness. In his jury instruction, the trial judge had supplanted the "fraudulent purpose" terminology of N.C. Gen. Stat. § 14-65 for the language of the charged crime of common law arson, "willful and malicious." Our Supreme Court stated:

> We do not decide whether the precise use of the term made here by the able trial judge constituted legal error. It might be argued that he defined "fraudulent purpose" to be in this case burning of the dwelling for the purpose of intimidating its occupant, a State's witness. This act would also be a wilful and malicious burning. Since, the argument goes, two or more things equal to the same thing are equal to each other the charge is saved from error. Be that as it may, and without considering all the factual circumstances which may be embraced by the term "fraudulent purpose," we believe that the concept has no place in a common law arson case. The better practice is to maintain a clear distinction between this ancient crime and burning for a fraudulent purpose as defined by G.S. 14-65.

*White*, 288 N.C. at 50, 215 S.E.2d at 561. We believe that destroying evidence in one's dwelling by setting fire to that dwelling fits within N.C. Gen. Stat. § 14-65 and is not precluded by the Supreme Court's restraint in *White* to assign a more narrow definition of "fraudulent purpose."

Fraud is defined as "[a] knowing misrepresentation of the truth or concealment of a material fact to induce another to act to his or her detriment. Fraud is usu[ally] a tort, but in some cases (esp[ecially] when the conduct is willful) it may be a crime." Black's Law Dictionary 660 (7th ed. 1999) There is substantial evidence that defendant intentionally burned the mobile home where he lived. As set out above in this opinion, there is substantial evidence of defend-

ant's guilt of the voluntary manslaughter of Angela. Taking the evidence in a light most favorable to the State, a jury could reasonably infer that defendant sought to suppress the truth and deliberately deceive law enforcement in the investigation of Angela's death by setting fire to his dwelling. We hold this to be a fraudulent purpose under N.C. Gen. Stat. § 14-65.

## IV. Jury Instruction Regarding Premeditation and Deliberation

[6] In defendant's fourth argument, he acknowledges in his brief that he failed to object to a jury instruction given by the trial court which gave examples of circumstances from which premeditation and deliberation could be inferred. Specifically, the trial court stated that an inference of premeditation and deliberation may be drawn from how a defendant handled the body from the time of the killing until the defendant disposed of the victim's body. Because defendant failed to object to this jury instruction, he must show the trial court committed plain error. Defendant supports his claim by arguing that there was no direct evidence that he ever handled Angela's body.

Plain error review by this Court is well settled in North Carolina:

"[T]he plain error rule . . . is always to be applied cautiously and only in the exceptional case where, after reviewing the entire record, it can be said the claimed error is a *fundamental* error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done,' or 'where [the error] is grave error which amounts to a denial of a fundamental right of the accused,' or the error has ' " 'resulted in a miscarriage of justice or in the denial to appellant of a fair trial' " ' or where the error is such as to 'seriously affect the fairness, integrity or public reputation of judicial proceedings' or where it can be fairly said 'the instructional mistake had a probable impact on the jury's finding that the defendant was guilty.' "

*State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (quoting *United States v. McCaskill*, 676 F.2d 995, 1002 (4th. Cir. 1982) (footnotes omitted) (emphasis in original), *cert. denied*, 459 U.S. 1018, 74 L. Ed. 2d 513 (1982)). Thus, for this Court to find plain error in the jury instruction concerning how a juror might draw inferences of premeditation and deliberation, defendant must show that absent such an instruction he would not have been found guilty of voluntary manslaughter.

Defendant was charged with first-degree murder. Premeditation and deliberation are the distinguishing elements of first-degree murder. Premeditation and deliberation are not elements of voluntary manslaughter, as set out above in this opinion. The trial court's example of how these elements of first-degree murder may be inferred is not plain error on a guilty verdict of voluntary manslaughter. The Supreme Court addressed this issue some time ago: The verdict finding defendant guilty of the lesser offense of voluntary manslaughter rendered harmless any errors in the court's instructions on the greater offense, absent a showing that the verdict was affected thereby. *State v. Mangum*, 245 N.C. 323, 330-31, 96 S.E.2d 39, 45 (1957); *see also State v. De Mai*, 227 N.C. 657, 44 S.E.2d 218 (1947). After careful review of the record and transcript, we see nothing to show that the challenged instruction to first-degree murder in any way affected the verdict rendered finding defendant guilty of voluntary manslaughter. This assignment of error is therefore overruled.

## V. Jury Instruction as to a Fraudulent Purpose

[7] Defendant's final argument contends that the trial court committed plain error when it instructed the jury that concealing evidence of Angela's death was a fraudulent purpose under N.C. Gen. Stat. § 14-65. Defendant argues that there is no North Carolina authority that burning a dwelling to conceal evidence is a "fraudulent purpose" under N.C. Gen. Stat. § 14-65. Our standard of review for plain error is cited above in *Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1985).

As we held previously, we have determined burning one's dwelling to frustrate an investigation is a "fraudulent purpose" and within the proscription of N.C. Gen. Stat. § 14-65. The trial court therefore did not commit plain error when it instructed the jury that concealing evidence relating to Angela's death could be considered a "fraudulent purpose."

Upon careful review of the record, the transcript, and the arguments presented by the parties, we conclude defendant received a fair trial, free from reversible error.

No error.

Judges MARTIN and LEVINSON concur.