STATE v. LOOMIS JOHNSON.

(Filed 20 September, 1922.)

1. Homicide—Murder—Justification—Evidence—Burden of Proof—Nonsuit.

Where the killing of a human being by the use of a deadly weapon is shown, the jury will be justified in rendering a verdict of murder in the second degree, at least, and the burden of proof being upon the prisoner to show matters in mitigation or to justify the jury in rendering a verdict in a less degree, or of acquittal, as they may be satisfied upon the evidence; a motion for a judgment as of nonsuit thereon cannot be sustained.

2. Criminal Law—Evidence—Nonsuit.

Upon a motion as of nonsuit, in a criminal action, the State is entitled to the most favorable consideration of the evidence.

3. Homicide — Murder—Justification—Evidence—Reasonable Apprehension—Questions for Jury—Trials.

Where there is evidence in justification, on the trial of a homicide, that the prisoner was without fault in bringing about the fight that resulted in the death, had fought unwillingly, and had committed the act with a deadly weapon while being attacked with one by the deceased, with murderous intent, it is not required that the prisoner show that it was actually necessary for him to have taken the deceased's life in order to preserve his own, but only whether in the judgment of the jury upon the evidence he had reasonable grounds to believe that it was necessary to do so under the circumstances.

4. Homicide—Murder—Justification—Murderous Intent.

Where justification is set up as a defense on a trial for murder, and it is proved by the prisoner that the deceased had attacked him with murderous intent, and that he had killed deceased without fault on his part,

the prisoner was under no obligation to fly, but could stand his ground and kill his adversary, if need be. The distinction between assaults with and without a felonious intent shown by WALKER, J.

**5. Appeal and Error—Instructions—Reversible Error—Conflicting Instructions—Homicide—Murder.**

Where the judge has erroneously charged, on the trial for a homicide, that the prisoner must show, with his evidence, the actual necessity for his having taken the life of the deceased in preserving his own life, as a justification for the killing, a correct instruction given elsewhere in the charge, without retracting the erroneous part, does not cure the error or render it harmless.

APPEAL by defendant from *Calvert, J.,* at the May Term, 1922, of CHATHAM.

The defendant was convicted of manslaughter, and from the judgment upon such conviction appealed to this Court.

The jury, in rendering the verdict of manslaughter, accompanied it with a request that the judge should be lenient in his punishment. The judgment was that the defendant be confined in the State's Prison for three years. Exceptions 1 and 2 were addressed to the refusal of his Honor to render judgment as of nonsuit at the end of the State's evidence, and again at the end of all the evidence.

The State's evidence tended to show that there was a dance and frolic on Saturday night, in February, 1922, at the house of Clarence Steele, in Chatham County. A party of young men at the dance engaged in shooting craps. Of this party were the defendant Johnson and the deceased, Guy McLean. Guy McLean charged Johnson with owing him a dime. Johnson denied this, and thereupon McLean grabbed at the money, and failing to get it, hit Johnson in the mouth. At this point Clarence Steele interfered and parted the two men. Johnson was standing talking to Clarence Steele, after the latter had parted the two fighters, when the deceased, Guy McLean, ran around and grabbed Johnson about the neck and was holding him and was striking him. Jasper McLean, a brother of Guy, interfered to keep Guy from hurting Johnson. While Guy McLean had Johnson around the neck and was striking him about the face and head, Johnson was trying to get away from him, but in the scuffle Johnson was pushed up in the corner, against the wall of the house. It was then that he struck backward with his knife and cut Guy McLean in the abdomen. This seems to have been the fatal blow. A wound was made in McLean's right side, a little below and to the right of the navel. It was at such a place, through the abdominal wall, that some of his intestines had oozed out, but none were punctured. McLean died at a hospital the following Tuesday week.

The witness Nettles testified: "At the time Loomis stabbed at Guy, Guy had him tight around the neck, with his head bent over. He had

his head under his arm and Loomis stabbed at Guy when he had him in that way. Loomis left the house just as soon as Guy turned him loose."

Dr. Harper testified that he saw the prisoner several days after the occurrence and dressed his wounds three times. He had a severe cut, which had extended entirely around his neck. There were quite a number of cuts on his neck and face, and he had a gash across his lip.

Wiley Crutchfield testified that at the time McLean ran around to the back of Johnson, Johnson was standing talking with Clarence Steele and had already quit the fight.

The defendant's own account of the transaction is as follows, and he is corroborated in his statement of the occurrence by other witnesses, particularly by Clarence Steele, the man at whose house the affray occurred: "I am 21 years old. Was born and raised in Chatham County. I have never been in any trouble before. I live with my father. I went to a party at Clarence Steele's. He lives about a half-mile from my home. This occurred on a Saturday night in February. Steele gave a dance and invited me. I got there about 8 o'clock. I had been working hard all day and lay down and went to sleep while the others were dancing, and about 11 o'clock I waked up and it was raining very hard. Some of the boys began shooting craps. I took part in the game, which was going on in the kitchen part of the house. The kitchen was a very small room. There were ten or twelve men in there at the time. Guy McLean was shooting craps. We were good friends, and I had known him for about ten years. I had a half-dollar lying on the floor. We were shooting for ten cents a shot. He claimed that he had a dime in the half-dollar. I told him that he was mistaken. He grabbed for the money and I snatched it back, and as I snatched the money back he struck me in the mouth. He hit me just as I grabbed at the money. I didn't strike him back. I jumped up and he got up and started toward me. Clarence Steele stepped right up between us and said, 'I am not going to have any fuss here.' I was not trying to get to him; I didn't make a step toward him. Clarence was standing between us, and while he was standing there Guy ran around to my back and grabbed me. He got me around the neck, held my head down and began cutting me. (The prisoner then exhibited to the jury a cut on his throat which extended from one ear almost around to the other, and several cuts about the face and ears.) He was still holding me. He had me around the neck so that I could not get loose, and we were going round and round. I was trying to break his hold. He was still cutting me and cutting at me. I did not know that he was mad when he first grabbed me. At this time he had gotten me in the corner and against the wall of the room, and I ran my hand in my pocket and got out my knife and opened it and stabbed back at him, because there was no other

STATE *v.* JOHNSON.

way for me to get loose, and I thought he was trying to kill me.  He had already cut my throat and my face in a number of places before I got my knife out, and was still cutting me when I stabbed him.  There was no chance for me to get loose from him in any other way.  I was trying to get away from him.  My back was to him when he had me around the neck cutting me.  Just as soon as he released his hold I ran away from him and left the house.  His brother Jasper was there, and I think he was trying to keep Guy from cutting my throat, and his holding his arm and trying to pull him away from me is why I think he did not succeed in killing me."

At the conclusion of the State's evidence, and again at the conclusion of all the evidence, the prisoner moved for a nonsuit, which was denied, and he excepted.

The judge then charged the jury, and to the instructions of the court the prisoner entered several exceptions.

The jury returned a verdict of manslaughter, and the prisoner was sentenced to three years in the State's Prison.

*Attorney-General Manning and Assistant Attorney-General Nash for the State.*

*Douglass & Douglass, Wade Barber, and A. C. Ray for defendant.*

WALKER, J., after stating the material facts:  There would seem to be very slight evidence of the prisoner's guilt, and yet there is sufficient to prevent a judgment of nonsuit, as a jury may find, from all the facts and circumstances, that the prisoner was not entirely blameless, or without any fault.  And, besides, we could not nonsuit the State, because there is some evidence for the jury in another view, for when there is a killing with a deadly weapon, as there was in this case, the law implies malice, and it is, at least, murder in the second degree, and the burden then rests upon the prisoner to satisfy the jury of facts and circumstances in mitigation of or excuse for the homicide, the credibility of the evidence, and its sufficiency to produce this satisfaction being for the jury to consider and decide.  The burden is not only upon the prisoner to mitigate or excuse the homicide, with the presumption of malice against him, but the State is entitled to the most favorable consideration of the evidence when there is a motion to nonsuit.

But, while this is so, we are of the opinion that the learned judge who presided at the trial committed an error in the following instruction to the jury, to which exception was duly taken:  "In order to excuse the killing, on the plea of self-defense, it is necessary for the accused to show that he quit the combat before the mortal wound was given, or

retreated or fled as far as he could with safety, and then, urged on by mere necessity, killed his adversary for the preservation of his own life."

It was incorrect and material error to charge the jury that the prisoner must have killed the deceased from mere necessity, in order to excuse the homicide. Whether there was any actual necessity for killing the deceased in order to save his own life, or to prevent great bodily harm to him, makes no difference, provided, at the time, the prisoner believed, and had reason to believe, that from the facts and circumstances as they then appeared to him he was about to be killed, or to suffer some enormous bodily harm.

The identical question is so fully discussed in *S. v. Barrett,* 132 N. C., 1005, at 1007, that we will refer somewhat copiously, but not literally, to what is there said in respect to this special principle. In some of the early cases expressions may be found which would seem to indicate that a case of self-defense is not made out unless the defendant can satisfy the jury that he killed the deceased from necessity, but we think the most humane doctrine, and the one which commends itself to us as being in accordance with the enlightened principles of the law, is to be found in the more recent decisions of this Court. It is better to hold, as we believe, that the defendant's conduct must be judged by the facts and circumstances as they appeared to him at the time he committed the act, and it should be ascertained by the jury, under the evidence and proper instructions of the court, whether he had a reasonable apprehension that he was about to lose his life or to receive enormous bodily harm. The reasonableness of his apprehension must always be for the jury, and not the defendant, to pass upon, but the jury must form their conclusion from the facts and circumstances as they appeared to the defendant at the time he committed the alleged criminal act. If his adversary does anything which is calculated to excite in his mind, while in the exercise of ordinary firmness, a reasonable apprehension that he is about to assail him and to take his life or to inflict great bodily harm, it would seem that the law should permit him to act in obedience to the natural impulse of self-preservation, and to defend himself against what he supposes to be a threatened attack, even though it may turn out afterwards that he was mistaken, provided always, as we have said, the jury find that his apprehension was a reasonable one, and that he acted with ordinary firmness. We think that the foregoing principle has been clearly stated and adopted by this Court in several cases.

In *S. v. Scott,* 26 N. C., 409; 42 Am. Dec., 148, this Court says: "In consultation, it seemed to us at one time that the case might have been left to the jury favorably to the prisoner on the principle of *Levet's case,* Cro. Car., 538 (1 Hale, 474), which is, if the prisoner had reasonable grounds for believing that the deceased intended to kill him, and under

that belief slew him, it would be excusable, or, at most, manslaughter, though in truth the deceased had no such design at the time."

And in *S. v. Nash,* 88 N. C., 618, the Court cites and approves the passage just quoted from *S. v. Scott, supra,* and then makes the following extract from *Com. v. Selfridge,* Harrigan & Thompson Cases on Self-defense, p. 1: "A., in the peaceful pursuit of his affairs, sees B. walking towards him with an outstretched arm and a pistol in his hand, and using violent menaces against his life as he advances. Having approached near enough in the same attitude, A., who has a club in his hand, strikes B. over the head before or at the instant the pistol is fired, and of the wound B. dies. It turned out, in fact, that the pistol was loaded with powder only, and that the real design of B. was only to terrify A." The judge inquired, "Will any reasonable man say that A. is more criminal than he would have been if there had been a ball in the pistol?" 2 Whar. Cr. Law, sec. 1026 (g), and note; Wharton Law of Homicide, 215 *et seq.*

So, in *S. v. Matthews,* 78 N. C., 534, the Court quotes with approval Foster's Crown Law, as follows: "It is stated in all of the authorities, and cannot be doubted, that if a man who is assailed believes, and has reason to believe, that although his assailant may not intend to take his life, yet he does intend, and is about to do him *some enormous bodily harm,* such as maim, for example, and under this reasonable belief he kills his assailant, it is homicide *se defendo,* and excusable. It will suffice if the assault is felonious." Foster, 274. See, also, *S. v. Nash,* 88 N. C., 618, where the principle herein stated was applied.

It is true that the judge in this case did, in another part of his charge, give the correct instruction, but he did not retract the erroneous one and substitute the other in its place; and, therefore, the jury were left to conjecture as to which of the two essentially different principles applied to this case. And in this connection we may well refer generally to what was said in *S. v. Barrett, supra,* at p. 1010, with reference to the same kind of charge: "The prisoner requested the court to charge the jury in accordance with this reasonable principle, and the court had given the special instructions, but in the general charge it changed the same materially by omitting therefrom the most important portion and requiring the prisoner to satisfy the jury that there was, at the time he fired the pistol, an actual necessity for killing the deceased. The jury, therefore, were left in doubt and uncertainty as to what was the true rule of law by which they should be guided in passing upon the prisoner's plea of self-defense, and the last instruction, which we may assume made the greatest impression upon the jury, called for more proof from the prisoner than the law required of him. He was, therefore, placed at a disadvantage, and consequently embarrassed and prejudiced in his

defense.   There is a marked difference between an actual necessity for killing and that reasonable apprehension of losing life or receiving great bodily harm, which is all that the law requires of the prisoner in order to excuse the killing of his adversary, and it was just this difference that may have caused the jury to decide against the prisoner upon this most important issue of the case."

Upon a similar question to that we have here, *Justice Bynum* said, in *S. v. Turpin,* 77 N. C., at p. 477: "Where one is drawn into a combat of this nature by the very instinct and constitution of his being, he is obliged to estimate the danger in which he has been placed, and the kind and degree of resistance necessary to his defense.   To do this he must consider not only the size and strength of his foe, how he is armed, and his threats, but also his character as a violent and dangerous man. It is sound sense, and we think sound law, that before a jury should be required to say whether the defendant did anything more than a reasonable man should have done under the circumstances, it should, as far as can be, be placed in the defendant's situation, surrounded with the same appearances of danger, with the same degree of knowledge of the deceased's probable purpose which the defendant possessed."

The question, therefore, was not whether he was confronted by the actual necessity to kill the deceased in order to preserve his own life, or to escape great bodily harm, but whether he believed, and had reasonable ground to believe, that such would be the result if he did not kill the deceased.

While we cannot nonsuit in this case, because of the presumption of malice arising from killing with a deadly weapon, and the further fact that the burden is upon the prisoner to satisfy the jury of the facts and circumstances which will either mitigate the homicide or excuse it altogether, and further, because the jury must pass upon the credibility of the evidence, we are of the opinion that, upon the evidence, as it is now presented, the court could well have instructed the jury, in accordance with *S. v. Dixon,* 75 N. C., at p. 278, that the innocence of the prisoner depends upon whether, from the whole testimony or from that of any witness, he himself at the time of the killing was without fault, and then had a reasonable ground to believe the attempt of the deceased was with the design of taking his life.   *S. v. Harris,* 1 Jones (46 N. C.), 190.   It is not denied that the advance of the deceased with the knife was an assault.   Was it made with a felonious intent, or did the prisoner have reasonable ground to believe it was?   The reasonableness of his apprehensions was not a question to be decided by the prisoner or the court, but by the jury, to whom it was not submitted.   Assuming that there was evidence from which the jury could infer that the prisoner had reasonable apprehension of the felonious intent, the remaining question

is, Was the prisoner himself without fault? That depends upon the evidence, upon which the jury must pass, though there may be very slight, if any, evidence that he was in fault. But the jury should say how it was, under instructions as to the law.

The general rule is that one may oppose another attempting the perpetration of a felony, if need be, to the taking of the felon's life; as in the case of a person attacked by another, intending to murder him, who thereupon kills his assailant. He is justified. 2 Bishop Cr. Law, sec. 632. A distinction which seems reasonable, and is supported by authority, is taken between assaults with felonious intent and assaults without felonious intent. In the latter the person assaulted may not stand his ground and kill his adversary, if there is any way of escape open to him, though he is allowed to repel force by force, and give blow for blow. In the former class, where the attack is made with murderous intent, the person attacked is under no obligation to fly; he may stand his ground and kill his adversary, if need be. 2 Bish. Cr. L., sec. 6333, and cases there cited. And so, Mr. East states the law to be. "A man may repel force by force, in defense of his person, habitation, or property, against one who manifestly intends or endeavors, by violence or surprise, to commit a known felony, such as murder, rape, burglary, robbery, and the like, upon either. In these cases he is not obliged to retreat, but may pursue his adversary until he has secured himself from all danger; and if he kill him in so doing, it is called justifiable self-defense." 1 East P. C., 271; 2 Bish. Cr. L., sec. 633. The American doctrine is to the same effect. "If the person thus assaulted, being himself faultless, reasonably apprehends death or great bodily harm to himself, unless he kill the assailant, the killing is justifiable." 2 Bish. Cr. L., sec. 644. The above statement of the law is taken from S. v. Dixon, 75 N. C., pp. 278, 279, 280, opinion by Justice Bynum. The questions arising in this case upon the prisoner's right of self-defense are fully considered and discussed in S. v. Pollard, 168 N. C., 116; where S. v. Dixon, supra; S. v. Barrett, supra; S. v. Kimbrell, 151 N. C., 702, are approved. And Justice Allen said, in S. v. Johnson, 166 N. C., 392, referring to the cases just cited: "These authorities, and many others to the same effect, could be cited establishing the following propositions: (1) That one may kill in self-defense to prevent death or great bodily harm. (2) That he may kill when not necessary if he believe it to be so, and has a reasonable ground for the belief. (3) That the reasonableness of the belief must be judged by the facts and circumstances as they appear to the party charged at the time of the killing." And in S. v. Gray, 162 N. C., 613, by the same justice: "One may kill when necessary in self-defense to himself, his family, or his home, and he has the same right when not actually necessary if he believes it to be so, and

has a reasonable ground for the belief." See *S. v. Vann,* 162 N. C., 535; *S. v. Robertson,* 166 N. C., 356; *S. v. Ray, ibid.,* 420.

It all comes to this, that if the jury find that the prisoner did not fight willingly, except in the sense that he was compelled to do so in order to defend himself and was himself without fault, and he was feloniously or murderously attacked by the deceased, so that it reasonably appeared to him, and he believed, that his life was in danger, or that he was about to receive great bodily harm, his right of self-defense was, in such a case, if found by the jury, complete and justifiable, and if he slew his adversary under such circumstances, the jury should acquit him. But there being the presumption of malice from the use of the deadly weapon, and, as we have said, the burden being upon the prisoner to show facts in mitigation or excuse of the homicide, and the credibility of the witnesses being for the jury to find, the case must be submitted to them with proper instructions, in accordance with the principles we have stated as especially applicable to this case.

While the evidence of the prisoner's guilt is very slight, we cannot find the facts, but must leave it to a properly instructed jury to do so, to whose province it properly belongs.

The error of the court in its charge entitles the prisoner to another jury, and it is so ordered.

New trial.