STATE OF NORTH CAROLINA v. CARITA JACOBS REVELS, Defendant

No. COA08-346

(Filed 3 March 2009)

**Criminal Law— self-defense—denial of instruction**

The trial court did not err in a second-degree murder case by denying defendant's request to instruct the jury on perfect and imperfect self-defense because: (1) it cannot be said that the inference that a knife might have been left in the back seat of a car by the victim and might have been picked up and used by the victim rose above mere possibility and conjecture; and (2) even if the victim did introduce the knife into the fight, there was no evidence that defendant, having disarmed the victim, then actually and reasonably believed that she needed to stab the victim multiple times resulting in her death after defendant received only a small cut on her index finger before she took the knife away.

Appeal by defendant from judgment entered 11 May 2007 by Judge D. Jack Hooks, Jr. in Robeson County Superior Court. Heard in the Court of Appeals 11 September 2008.

*Attorney General Roy Cooper, by Special Deputy Attorney General Norma S. Harrell, for the State.*

*Kathryn L. VandenBerg for defendant-appellant.*

GEER, Judge.

Defendant Carita Jacobs Revels appeals her conviction of second degree murder, arguing that the trial court erred in denying her request to instruct the jury on perfect and imperfect self-defense. Based upon our review of the record, we conclude that there was insufficient evidence that defendant in fact formed an actual, reasonable belief that it was necessary to kill the victim to protect herself from death or serious bodily injury, and, therefore, the trial court did not err in refusing to submit the issue of self-defense to the jury.

Facts

Defendant separated from her husband Gary Revels in January 2004 when he began a relationship with Tina Strickland, the victim in this case. Mr. Revels often stayed with Ms. Strickland at her apartment, but occasionally they would stay in the trailer in which Mr.

STATE v. REVELS

[195 N.C. App. 546 (2009)]

Revels and defendant used to live. Defendant indicated that she was angry with Ms. Strickland for dating defendant's husband and because she believed that Ms. Strickland was beating defendant's children. On several occasions, defendant stated: "I'm going to kill that bitch."

Sometime in May 2004, defendant went to Ms. Strickland's apartment and began beating on the door and yelling for Ms. Strickland to come outside. When Ms. Strickland came out, defendant kicked her in the stomach twice, punched her, and used a choke hold on her. The fight ended after a few minutes with Ms. Strickland suffering some scratches and bruises. Afterward, the two shook hands, and defendant left.

Roughly two weeks later, on 28 May 2004, another fight occurred involving defendant and Ms. Strickland. Ms. Strickland was out "cruising" with friends from school, Brittany and Brook Bullard, in Brook's Mitsubishi Galant. Ms. Strickland was in the back seat, Brittany was in the passenger seat, and Brook was driving. When Brook saw her cousin waving at them from an Amoco parking lot, she pulled in to talk.

Defendant was also out "cruising" with Brandi Oxendine, the 15-year-old daughter of Toby Oxendine, the man defendant was dating at that time. Defendant had consumed at least one bottle of beer while driving. Brandi asked defendant to turn into the Amoco so she could talk to a friend.

As defendant was pulling into the parking lot, she spotted Ms. Strickland. Defendant got out of her car and walked over to Brook Bullard's car. As defendant approached, Ms. Strickland got out of the back seat and began walking toward defendant. Some witnesses testified that they saw defendant hit Ms. Strickland in the head with a beer bottle, while other witnesses stated that they never saw defendant holding a beer bottle. The witnesses agreed, however, that defendant and Ms. Strickland began fighting, hitting each other with their fists and pulling each other's hair.

By all accounts, defendant was "winning" the fight, but at some point, Ms. Strickland pushed defendant through the open back door of Brook Bullard's car onto the back seat with Ms. Strickland then on top of defendant. Brandi Oxendine tried to grab Ms. Strickland to stop the fight, but Brittany Bullard pulled her away. None of the witnesses testified about what happened further in the back seat until

Ms. Strickland came stumbling out of the car, falling backward onto Brittany Bullard, and passing out. Defendant followed, swinging a knife with blood on it. Defendant had a cut on her right index finger and blood running down her leg.

Brittany Bullard grabbed defendant and tried to wrestle the knife away from her. While Brittany was holding defendant, defendant kept yelling: "Let me go. Let me go. I'll finish killing that bitch." Ms. Strickland's brother, who was also at the gas station that evening, slapped the knife out of defendant's hand, and a woman then kicked the knife across the parking lot. Someone had called the police during the fight, and Officer Charles Maynor arrived at that point, took defendant over to his vehicle, and handcuffed her. Defendant told Officer Maynor: "If you'll take these handcuffs off of me I'll go over there and I'll kill her—finish killing her."

When Ms. Strickland's shirt was lifted up, she was covered in blood. She was taken to the hospital, and emergency surgery was performed, but she ultimately died. The autopsy showed that Ms. Strickland had lacerations and bruising on the right side of her head, near her ear and neck. She had abrasions on her knuckles and fingers and a cut on her elbow. The medical examiner found a stab wound on her left shoulder that was three-and-a-half inches deep; a stab wound on the right side of her chest that was also about three-and-a-half inches deep that punctured her lung; and, a stab wound on her left side going under her arm into her breast and penetrating approximately five inches. This last wound penetrated Ms. Strickland's left ventricle, killing her.

Defendant was arrested and indicted for first degree murder. Defendant pled not guilty and was tried before a jury in Robeson County Superior Court. The primary disputes at trial were about the knife and what happened in the back seat of the car. The State presented evidence, through the testimony of defendant's boyfriend at the time, Toby Oxendine, that defendant routinely carried a knife with her in her right back pocket. He described it as being a military-style knife about six to seven inches long with a black handle. Mr. Oxendine testified that the knife identified at trial as the one recovered from the parking lot was the knife that defendant regularly carried. In his statement to the police, however, Mr. Oxendine had not mentioned defendant's routinely carrying a knife, but rather had said he saw defendant pick up one of his knives from his dresser before she left the house on 28 May 2004.

Mr. Oxendine, who was no longer dating defendant, also testified that defendant told him that she saw Ms. Strickland in the parking lot, pulled in, dragged Ms. Strickland from the car, and started beating her up. Defendant told him that she was losing the fight in the back seat of the car, so she pulled out the knife and started stabbing Ms. Strickland. She then cut her own finger to "cover it up to make it look like self-defense . . . ." On cross-examination, Mr. Oxendine admitted that he had not given a statement to the police until after he had broken up with defendant.

The State also presented the testimony of Mr. Oxendine's daughter, Brandi Oxendine. As was established during the trial, on 1 June 2004, Brandi gave a statement to the police that she had seen Ms. Strickland with a knife and that defendant took it away from her. On 21 June 2004, however, Brandi gave another statement to the police asserting that she never saw a knife. Brandi claimed that her first statement was based on what defendant had said in the parking lot on the day of the stabbing. She acknowledged, however, that she gave her second statement after defendant and her father had broken up.

Defendant did not testify at trial, but did present the testimony of Gary Revels, who at the time of the homicide was defendant's husband, but was seeing Ms. Strickland. Mr. Revels and defendant had, prior to the trial, reconciled. Mr. Revels testified that his father had given him several knives from a set for Christmas 2003. He stated that he kept one of the knives with him at all times in his pocket. He described the knife as having a stainless steel blade and see-through "louvers." According to Mr. Revels, on 28 May 2004, Ms. Strickland took his knife out of his pocket and left with Brittany and Brook Bullard to drive into town. He then identified the knife introduced at trial as the weapon used by defendant as being his knife, the one Ms. Strickland took from him on 28 May 2004. Mr. Revels' father also identified the knife introduced at trial as one given by him to his son from a set of 12 identical knives.

At the charge conference, defendant requested that the trial court instruct the jury on perfect self-defense and voluntary manslaughter based on imperfect self-defense. The trial court denied defendant's request and instructed the jury only on first and second degree murder. The jury convicted defendant of second degree murder, and the trial court sentenced defendant to a presumptive-range term of 180 to 225 months imprisonment. Defendant timely appealed to this Court.

**STATE v. REVELS**

[195 N.C. App. 546 (2009)]

## Discussion

Defendant argues that when the trial court instructed the jury on first and second degree murder as possible verdicts, the court also should have instructed the jury on perfect self-defense and voluntary manslaughter based on imperfect self-defense. "The right to kill in self-defense is based on the necessity, real or reasonably apparent, of killing an unlawful aggressor to save oneself from imminent death or great bodily harm at his hands." *State v. Norman*, 324 N.C. 253, 259, 378 S.E.2d 8, 12 (1989) (emphasis omitted).

When there is evidence that defendant acted in self-defense, the trial court must submit the issue to the jury even though there is contradictory evidence by the State or discrepancies in the defendant's evidence. *State v. Dooley*, 285 N.C. 158, 163, 203 S.E.2d 815, 819 (1974); *see State v. Guss*, 254 N.C. 349, 351, 118 S.E.2d 906, 907 (1961) ("The jury must not only consider the case in accordance with the State's theory but also in accordance with defendant's explanation."). The trial court must consider the evidence in the light most favorable to the defendant in deciding whether the evidence is sufficient to entitle a defendant to jury instructions on self-defense. *State v. Watkins*, 283 N.C. 504, 509, 196 S.E.2d 750, 754 (1973).

There are two types of self-defense: perfect and imperfect. "Perfect self-defense excuses a killing altogether, while imperfect self-defense may reduce a charge of murder to voluntary manslaughter." *State v. Ross*, 338 N.C. 280, 283, 449 S.E.2d 556, 559 (1994). Perfect self-defense is established when the following four elements exist at the time of the homicide:

"(1) it appeared to defendant and he believed it to be necessary to kill the deceased in order to save himself from death or great bodily harm; and

(2) defendant's belief was reasonable in that the circumstances as they appeared to him at that time were sufficient to create such a belief in the mind of a person of ordinary firmness; and

(3) defendant was not the aggressor in bringing on the affray, i.e., he did not aggressively and willingly enter into the fight without legal excuse or provocation; and

(4) defendant did not use excessive force, i.e., did not use more force than was necessary or reasonably appeared to him to be necessary under the circumstances to protect himself from death or great bodily harm."

*State v. Lyons*, 340 N.C. 646, 661, 459 S.E.2d 770, 778 (1995) (quoting *State v. McAvoy*, 331 N.C. 583, 595, 417 S.E.2d 489, 497 (1992)). In contrast, imperfect self-defense is established if the first two elements exist at the time of the homicide, "but the defendant, without murderous intent, either was the aggressor in bringing on the affray or used excessive force." *Id.*

Thus, for a defendant to be entitled to *any* instruction on self-defense, "two questions must be answered in the affirmative: (1) Is there evidence that the defendant in fact formed a belief that it was necessary to kill his adversary in order to protect himself from death or great bodily harm, and (2) if so, was that belief reasonable?" *State v. Bush*, 307 N.C. 152, 160, 297 S.E.2d 563, 569 (1982). If the evidence requires a negative answer to either question, a self-defense instruction should not be given. *Id.* at 160-61, 297 S.E.2d at 569.

Although defendant did not testify at trial, a defendant is not required to testify or offer evidence in order for the jury to be instructed on the law of self-defense. Instead, "[a] defendant is entitled to an instruction on self-defense if there is *any evidence in the record* from which it can be determined that it was necessary or reasonably appeared to be necessary for him to kill his adversary in order to protect himself from death or great bodily harm." *Id.* at 160, 297 S.E.2d at 569 (emphasis added); *accord State v. Deck*, 285 N.C. 209, 215, 203 S.E.2d 830, 834 (1974) (holding *State's evidence* was sufficient to permit jury to reasonably conclude defendant killed in self-defense).

Defendant maintains that if Ms. Strickland was the one who pulled out the knife during the fight, then it is reasonable to infer that defendant actually and reasonably believed it was necessary to use deadly force. Even assuming *arguendo* that we may draw such an inference, there is still insufficient evidence to support the underlying premise: that Ms. Strickland pulled out the knife and threatened defendant with it. Defendant points to the evidence identifying the knife used in the stabbing as one taken by Ms. Strickland from Mr. Revels that day. Defendant then argues that neither woman had a knife before defendant was pushed into the back seat of the car. According to defendant, because Ms. Strickland had been riding in the back seat, it is reasonable to infer that Ms. Strickland had left the knife in the back seat, pushed defendant into the back seat so that Ms. Strickland could get the knife, and then Ms. Strickland used the knife on defendant. Defendant contends that the cut on her finger was a defensive wound.

· The evidence viewed in the light most favorable to defendant would require us to assume that the knife used was the one carried by Ms. Strickland. Nevertheless, while defendant asks this Court to infer that the knife was left in the back seat where Ms. Strickland had been sitting, the record contains no evidence allowing that inference apart from the fact that Ms. Strickland was sitting somewhere in the back of the car sometime prior to the fight. In addition, even if the knife was in some unidentified location in the back seat area of the car prior to defendant's being pushed into the car, no evidence exists from which the inference can be drawn that Ms. Strickland picked up the knife from its location rather than defendant. As the State notes in its brief, "[o]ne could just as easily speculate that [Ms. Strickland] left the knife on the back seat of the car or it had fallen out there and that the defendant found it or that defendant pulled it out of [Ms. Strickland]'s pocket and stabbed [her] with intent to kill her."

It has long been the law that " '[e]vidence which merely shows it possible for the fact in issue to be as alleged, or which raises a mere conjecture that it was so, is an insufficient foundation for a verdict, and should not be left to the jury.' " *State v. Clark*, 324 N.C. 146, 162, 377 S.E.2d 54, 64 (1989) (quoting *State v. Vinson*, 63 N.C. 335, 338 (1869)). Here, we cannot say that the inference that the knife might have been left in the back seat and might have been picked up and used by Ms. Strickland rises above mere possibility and conjecture. *See State v. Wolfe*, 157 N.C. App. 22, 28, 577 S.E.2d 655, 660 (holding that mere fact victim had gun residue on his hand and, therefore, he possibly held gun was not sufficient to support self-defense instruction when defendant did not testify he saw gun, and no gun was found near victim), *appeal dismissed and disc. review denied*, 357 N.C. 255, 583 S.E.2d 289 (2003).

Moreover, even if Ms. Strickland did introduce the knife into the fight, the evidence is undisputed that defendant received only a small cut on her index finger before she took the knife away from Ms. Strickland. There is no evidence that defendant, having disarmed Ms. Strickland, then actually and reasonably believed that she needed to stab Ms. Strickland multiple times, resulting in her death. *See State v. Coley*, 193 N.C. App. 458, 467-68, 668 S.E.2d 46, 53 (2008) (holding that trial court did not err in refusing to give self-defense instruction when defendant's evidence revealed that although victim reached for knife, defendant grabbed it first and offered no evidence that, after securing knife, he still reasonably believed he had to kill

victim), *disc. review denied*, 363 N.C. 132, 673 S.E.2d 664, *aff'd per curiam*, 363 N.C. 622, 683 S.E.2d 208 (2009); *State v. Hayes*, 130 N.C. App. 154, 180, 502 S.E.2d 853, 870 (1998) ("The defendant wrestled the bat from her and only after obtaining sole possession of the bat did he proceed to strike her multiple times about her body with the bat causing her death. There is no evidence in this record that shows that Mrs. Hayes presented any threat to the defendant after he acquired the bat from her."), *aff'd in part and modified in part, disc. review improvidently allowed in part*, 350 N.C. 79, 511 S.E.2d 302 (1999).

Defendant, however, points to three cases in which the appellate courts held that the trial court was required to instruct on self-defense: *State v. Johnson*, 184 N.C. 637, 113 S.E. 617 (1922), *State v. Hayes*, 88 N.C. App. 749, 364 S.E.2d 712 (1988), and *State v. Hughes*, 82 N.C. App. 724, 348 S.E.2d 147 (1986). None of these cases is apposite here. In *Johnson*, 184 N.C. at 638-40, 113 S.E. at 617-18, unlike in this case, there was substantial, although conflicting, testimony regarding what actually occurred during the fight that resulted in the victim's death. Similarly, in *Hayes*, 88 N.C. App. at 750, 364 S.E.2d at 712, the defendant presented evidence—conflicting with the State's—about what happened during the fight in which the victim was fatally stabbed. Finally, in *Hughes*, 82 N.C. App. at 728, 348 S.E.2d at 150, the defendant testified at trial that "[the victim] was in fact armed and a threat to defendant's life or health."

Rather than supporting defendant's argument, *Johnson, Hayes*, and *Hughes* highlight the weakness in defendant's argument: she cannot point to any evidence regarding what happened in the back seat of that car. While the evidence would permit a reasonable juror to find that Ms. Strickland was killed with her own knife, there is no evidence as to where the knife was before it was introduced into the fight, how or by whom it was introduced, how defendant obtained the knife, and why she believed it necessary to stab Ms. Strickland multiple times after disarming her. Under these circumstances, we hold that the trial court did not err in refusing to instruct the jury on perfect or imperfect self-defense.

No Error.

Judges STEELMAN and STEPHENS concur.