IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-211

No. COA21-512

Filed 5 April 2022

Craven County, Nos. 18 CRS 52743, 19 CRS 158, 20 CRS 571

STATE OF NORTH CAROLINA

v.

JEFFERY RAY ACKER

Appeal by defendant from judgments entered 30 March 2021 by Judge John E. Nobles, Jr., in Craven County Superior Court. Heard in the Court of Appeals 22 February 2022.

*Attorney General Joshua H. Stein, by Special Deputy Attorney General Michael T. Wood, for the State.*

*Michael E. Casterline for defendant-appellant.*

ARROWOOD, Judge.

¶ 1        Jeffery Ray Acker ("defendant") appeals from judgments entered upon his convictions for second-degree murder, robbery with a dangerous weapon, and felony larceny. Defendant contends the trial court committed plain error by failing to instruct the jury on self-defense and manslaughter. For the following reasons, we hold the trial court did not commit plain error in defendant's trial.

I.        Background

¶ 2        On 11 February 2019, a Craven County grand jury indicted defendant for first-degree murder and felony larceny of a motor vehicle. On 3 August 2020, defendant was indicted for robbery with a dangerous weapon.

¶ 3        The matter came on for trial on 22 March 2021 in Craven County Superior Court, Judge Nobles presiding. The evidence adduced at trial tended to show as follows.

¶ 4        In August 2018, defendant resided in a singlewide mobile home with his parents (collectively, "the Ackers") in Vanceboro, North Carolina. The singlewide belonged to Carolyn Patterson ("Patterson"), who lived in a doublewide mobile home on the same property. The Ackers assisted Patterson with lawn maintenance and other household chores, in part because Patterson had fibromyalgia and an ankle condition that required her to wear a protective boot. Patterson had a long relationship with the Ackers and had known defendant for his entire life.

¶ 5        Defendant's two nephews also lived on the property; Tyler[1] lived in the singlewide with the Ackers, and Brian lived in the doublewide with Patterson. Patterson's cousin, Heather Warren ("Warren"), testified that Patterson had raised Brian since he was an infant and she thought of him as her own son. Brian's father had legal custody pursuant to a 2014 consent order but allowed Patterson to raise

---

[1] The juveniles are referred to by pseudonyms to protect their identity in accordance with Rule 42(b) of the North Carolina Rules of Appellate Procedure.

Brian; Patterson did not have any legal custody of Brian. Brian's mother, Prescilla Tripp ("Tripp") testified that the Department of Social Services ("DSS") became involved with the family in August 2018; Tripp stated that a conclusion had not been reached, but that DSS was "going to remove [Brian] from [Patterson's] home." Tripp also testified that she established visitation with Brian "[e]very other weekend[,]" which was set by a schedule "handwritten" by Patterson.

¶ 6        On 23 August 2018, Brian was staying with Tripp, several days after his scheduled return to Patterson. On the afternoon of 23 August, Tripp took Brian, Tyler, and several other family members to Brian's school for orientation. Patterson also came to the school for the orientation event and got into a confrontation with Tripp over completing Brian's emergency contact paperwork.

¶ 7        After the school orientation concluded, Tripp took Brian back to the Acker's singlewide. Tripp testified that defendant was at the singlewide, had been drinking, and smelled of "strong alcohol." Tripp described defendant as a "functioning alcoholic"; defendant later testified that he also considered himself to be a functioning alcoholic.

¶ 8        Shortly before Tripp left the property, Patterson walked over to the singlewide, forcefully knocked on the window, and "said something." Tripp then returned to her home with Brian.

¶ 9        Defendant testified that at some point after Tripp left, Patterson called him

over to her doublewide. Defendant stated that he went over to Patterson's trailer and observed Patterson pacing between two bedrooms in the trailer and swearing loudly. Defendant testified that he saw a black object in Patterson's hand, "[w]hich appeared to be a gun[,]" making defendant think that Patterson was "going to kill herself." At that point, defendant walked away from Patterson's doublewide and sat on a porch swing at the singlewide.

¶ 10          After sitting on the porch swing for a while, defendant heard Patterson call out to him again. Defendant testified that he slowly walked the long way around to Patterson's doublewide to have a clear view of her and saw that "there was nothing in her hand." Defendant saw that Patterson was in the computer room of her doublewide, and although defendant "felt awkward[,]" he went inside to "see what she wanted to say." Defendant testified that he commonly played a "peacemaker" role with Patterson.

¶ 11          In the computer room, Patterson asked defendant what he knew about the situation with Brian. Defendant testified that he told Patterson "DSS is going to take [Brian] from [her]." Defendant stated that "everything in the room changed[,]" Patterson began cursing and "throwing her hands" around, and at one point when Patterson turned, defendant "saw the same black object that [he] thought was a gun[.]" Defendant testified that he reached down and grabbed a baseball bat, and "must have swung it once and dropped it immediately." Defendant stated that he

blacked out at that point and could not remember anything until the next day. Defendant was later asked, "[y]ou didn't mean to kill her; is that right[,]" to which defendant responded, "I would never kill anybody."

¶ 12        Ethel Acker ("Ms. Acker"), defendant's mother, testified that on the evening of 23 August, defendant was "out there in the yard" for some time, but eventually came inside, ate supper, and went to sleep. Ms. Acker testified that on the morning of 24 August, defendant woke her up and told her that Patterson had left early that morning and that Patterson's car was not there.

¶ 13        Jaron Whealton ("Whealton") testified that on 24 August 2018, he was working at a Mini Mart in Oriental, North Carolina. Whealton testified that defendant came into the store at around 11 a.m. and bought a fish sandwich; Whealton later saw defendant sitting outside in a van, eating the sandwich. On the evening of 24 August, Whealton again encountered defendant, this time at a waterfront bar near a marina in Oriental. When Whealton engaged defendant in conversation, defendant stated that he had killed a woman with a baseball bat. Whealton also testified that defendant did not make any statements indicating that Patterson had a weapon or that defendant feared for his life during the incident.

¶ 14        Defendant made similar statements to other people nearby. Elizabeth DeWitt ("Ms. DeWitt") testified that she and her husband, Robert ("Mr. DeWitt") encountered defendant at the waterfront; defendant sat next to Mr. DeWitt and said, "You can't

get arrested in this town." When Mr. DeWitt asked defendant why, defendant responded that "he had killed a lady and he couldn't get arrested." Ms. DeWitt noted that defendant "seemed intoxicated" and had a blood stain on the front of his shirt. When asked if defendant had told Mr. Dewitt or Ms. DeWitt why he killed Patterson, Ms. DeWitt replied that defendant said Patterson "was talking shit about his family and the kids."

¶ 15        At around 8:15 p.m., defendant made a 911 call from the bar. Defendant told the operator that "something had happened the night before[,]" and that "he woke up that morning and realized what he had done[.]" When officers arrived at the waterfront, they encountered defendant, who was swaying and slurring his words. Defendant told police multiple times that he had killed Patterson, but did not know why. Pamlico County Sherriff's Office Investigator Tyquan Thompson ("Investigator Thompson") testified that defendant attempted to resist being detained, including trying to kick Investigator Thompson in the face while being placed in the patrol car.

¶ 16        Defendant was subsequently transported to the Pamlico County jail, where he waived his rights and was interrogated. Defendant, who "had a lot of blood on his shirt[ ] and his pants[,]" again told police that he killed Patterson with a baseball bat. Defendant "repeated over and over" that he hit Patterson in the head with a bat, first saying that he hit her "a couple of times," and later "three or four times[,]" with his statements seeming to "change as his mood went and the longer" he was in custody.

At one point, defendant mentioned "that he thought he did [Patterson] a favor" by hitting her from behind "because it probably would hurt less." Defendant also told police that Patterson threatened to cut off the power to the Acker's singlewide and evict them from the property.

¶ 17        When police went to Patterson's home that evening, they found her body on the floor of the computer room. Patterson's body was covered in a white sheet, and a baseball bat was found lying under her body. State Bureau of Investigation Crime Scene Investigator Laura Kensington ("Kensington") testified that blood and brain matter were on the floor, and that cast-off blood splatter patterns on the walls and ceiling indicated that the baseball bat had been moving around in several directions. Kensington also testified that there were no defensive injuries on Patterson's hands or arms. No weapons other than the bat were recovered from Patterson's doublewide.

¶ 18        Onslow County Medical Examiner Dr. Anuradha Arcot ("Dr. Arcot") conducted an autopsy on Patterson. Dr. Arcot testified that Patterson had multiple skull fractures on the right side and back of her head, and the cause of death was determined to be a head injury. Dr. Arcot testified that Patterson's skull suffered severe fractures; although there were "way too many [skull fractures] to count," it appeared to Dr. Arcot that Patterson had been struck at least three times.

¶ 19        Patterson's van was found abandoned on a road outside of Oriental. Defendant's EBT card was found in the van when it was processed, and the keys to

the van were in defendant's pocket when he was taken into custody.

¶ 20 On 4 February 2021, defendant's trial counsel filed a pre-trial notice of self-defense pursuant to N.C. Gen. Stat. § 15A-905(c). At trial, defendant's attorney submitted a written request for jury instructions, including requests for self-defense and manslaughter instructions. At the charge conference, defendant's trial counsel made the following request:

> We would also, for the record, Your Honor, that based on the evidence [defendant] testified to, that he was in fear of bodily harm, Your Honor, by the victim. And that he acted accordingly, Your Honor, for self-defense, Your Honor. Therefore, giving rise to the instruction of manslaughter.

After hearing from the prosecutor, the trial court made the following statement in ruling against the requested instruction:

> I don't see evidence to support a manslaughter instruction in this case. Seems like articulation of the situation here is the -- in no way indicated to me that it was anything other than a fantasy. The statement of being afraid was anything other than a fantasy.

¶ 21 The prosecutor requested that the trial court not instruct the jury on intoxication, while defendant's trial counsel argued that defendant's testimony supported the instruction. The trial court concluded that there was sufficient evidence to warrant an instruction on voluntary intoxication, as well as second-degree murder. The trial court then asked defendant's trial counsel the following:

> THE COURT: All right, Mr. Brown, for purposes of the

record, you're in agreement with the jury instructions? Each instruction is what you requested also with the exception of your objection to lying in wait?

MR. BROWN: That is correct, Your Honor.

¶ 22   The jury was not instructed on the charge of manslaughter or on self-defense. Defendant's trial counsel did not object to the jury instructions as issued; when the trial court asked for "any additions or requests or deletions" with respect to the jury charge, defendant's trial counsel responded, "No, Your Honor."

¶ 23   On 30 March 2021, the jury found defendant guilty of second-degree murder, felony larceny of a motor vehicle, and felony robbery with a dangerous weapon. Defendant pleaded to an aggravating factor for sentencing, specifically a probation revocation within the previous ten years. The trial court made a finding for this aggravating factor and found no mitigating factors. Defendant was sentenced to consecutive aggravated sentences of 365 to 438 months for second-degree murder and 97 to 129 months for robbery with a dangerous weapon. Judgment was arrested on the felony larceny conviction.

¶ 24   Defendant gave oral notice of appeal in open court.

## II.   Discussion

¶ 25   Defendant contends the trial court plainly erred in failing to give requested jury instructions on self-defense and manslaughter. Defendant alternatively argues

that the issue may be reviewable under a *de novo* standard and that defendant

sufficiently presented a *prima facie* case for self-defense.

## A.    Standard of Review

Under the North Carolina Rules of Appellate Procedure,

> A party may not make any portion of the jury charge or
> omission therefrom the basis of an issue presented on
> appeal unless the party objects thereto before the jury
> retires to consider its verdict, stating distinctly that to
> which objection is made and the grounds of the objection;
> provided that opportunity was given to the party to make
> the objection out of the hearing of the jury, and, on request
> of any party, out of the presence of the jury.

N.C.R. App. P. 10(a)(2).

> In criminal cases, an issue that was not preserved by
> objection noted at trial and that is not deemed preserved
> by rule or law without any such action nevertheless may be
> made the basis of an issue presented on appeal when the
> judicial action questioned is specifically and distinctly
> contended to amount to plain error.

N.C.R. App. P. 10(a)(4).

In his principal brief, defendant acknowledges that his trial counsel failed to

object to the jury charge after the instructions were given.  In his reply brief and at

oral argument, however, defendant argued that the issue may be reviewable under a

*de novo* standard because "[i]t is not necessary for a defendant to repeat his objection

to the instruction after the trial court denies the proposed instruction."  In support of

this argument, defendant cites *State v. Smith*, 311 N.C. 287, 290, 316 S.E.2d 73, 75

(1984) ("Defendant is not required by . . . the North Carolina Rules of Appellate Procedure . . . to repeat his objection to the jury instructions, after the fact, in order to properly preserve his exception for appellate review."). In *Smith*, our Supreme Court concluded that the defendant's objection was preserved where "defense counsel submitted a written request for particular instructions prior to the jury arguments, which the court denied." *Id.*

¶ 28      Our review of the transcript and record reveal that *Smith* is distinguishable from this case. Here, defendant's trial counsel submitted a written request for self-defense and manslaughter instructions and subsequently argued the issue during the charge conference. After the trial court denied defendant's request, the trial court asked if defendant's trial counsel was in agreement with the jury instructions; defendant's trial counsel responded, "That is correct, Your Honor." After the jury instructions were given, the trial court again asked if defendant had "any additions or requests or deletions" with respect to the jury charge; defendant's trial counsel responded "No, Your Honor." Defendant's trial counsel was given two opportunities to make distinct objections to jury instructions, and instead expressed agreement with the given instructions. Although *Smith* may stand for the principle that one objection, with no further action addressing the matter, is sufficient to preserve an exception for appellate review, the exception was not sufficiently preserved in this case.

¶ 29    Because defendant failed to preserve the issue for appellate review, we review for plain error. Defendant's alternative arguments that he made a *prima facie* case for self-defense are overruled.

## B.    Jury Instructions

¶ 30    Under the plain error standard, "a defendant must demonstrate that a fundamental error occurred at trial[,]" which requires a showing that defendant was prejudiced and that the error "had a probable impact on the jury's finding that the defendant was guilty." *State v. Lawrence*, 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012) (citations and quotation marks omitted).

¶ 31    "The trial judge must, without special request, charge the law applicable to the substantive features of the case arising on the evidence and apply the law to the essential facts of the case." *State v. Covington*, 317 N.C. 127, 131, 343 S.E.2d 524, 527 (1986) (citation and quotation marks omitted). "[D]efenses raised by the evidence constitute substantial features requiring an instruction." *State v. Jones*, 300 N.C. 363, 366, 266 S.E.2d 586, 587 (1980) (citation omitted).

### 1.    Self-Defense

¶ 32    In North Carolina, we recognize two types of self-defense: perfect and imperfect. *State v. Revels*, 195 N.C. App. 546, 550, 673 S.E.2d 677, 681 (2009). The elements for perfect self-defense are as follows:

> (1) it appeared to defendant and he believed it to be

necessary to kill the deceased in order to save himself from death or great bodily harm; and

(2) defendant's belief was reasonable in that the circumstances as they appeared to him at that time were sufficient to create such a belief in the mind of a person of ordinary firmness; and

(3) defendant was not the aggressor in bringing on the affray, i.e., he did not aggressively and willingly enter into the fight without legal excuse or provocation; and

(4) defendant did not use excessive force, i.e., did not use more force than was necessary or reasonably appeared to him to be necessary under the circumstances to protect himself from death or great bodily harm.

*State v. Lyons,* 340 N.C. 646, 661, 459 S.E.2d 770, 778 (1995) (quoting *State v. McAvoy,* 331 N.C. 583, 595, 417 S.E.2d 489, 497 (1992)).

¶ 33        Imperfect self-defense is established where the first two elements are satisfied, "but the defendant, without murderous intent, either was the aggressor in bringing on the affray or used excessive force." *Revels*, 195 N.C. App. at 551, 673 S.E.2d at 681 (citation and quotation marks omitted). A defendant acting in imperfect self-defense is "guilty of at least voluntary manslaughter . . . ." *State v. Larry*, 345 N.C. 497, 519, 481 S.E.2d 907, 919 (1997) (quoting *Lyons*, 340 N.C. at 661, 459 S.E.2d at 778).

¶ 34        "Where there is evidence that defendant acted in self-defense, the court must charge on this aspect even though there is contradictory evidence by the State or discrepancies in defendant's evidence." *State v. Dooley*, 285 N.C. 158, 163, 203 S.E.2d 815, 818 (1974) (citations omitted). "However, if there is no evidence from which the

jury reasonably could find that defendant in fact believed that it was necessary to kill his adversary to protect himself from death or great bodily harm, then the defendant is not entitled to have the jury instructed on self-defense." *State v. Webster*, 324 N.C. 385, 391, 378 S.E.2d 748, 752 (1989) (citation omitted). "In determining whether there was any evidence of self[-]defense presented, the evidence must be interpreted in the light most favorable to the defendant." *State v. Gappins,* 320 N.C. 64, 71, 357 S.E.2d 654, 659 (1987) (citations omitted).

¶ 35        Accordingly, to establish that the trial court plainly erred in failing to instruct the jury on self-defense, defendant was required to first establish that "it appeared to defendant and he believed it to be necessary to kill [Patterson] in order to save himself from death or great bodily harm[.]" *See Lyons,* 340 N.C. at 661, 459 S.E.2d at 778 (citation omitted). Defendant argues that his testimony at trial established that he had a reasonable ground for his belief that killing Patterson was necessary. We disagree.

¶ 36        Defendant testified that Patterson was angry and "throwing her hands" around, but did not testify that Patterson threatened to harm him. Instead, when the prosecutor asked whether defendant "didn't mean to kill" Patterson, defendant responded that he "would never kill anybody." Defendant testified that on the night he killed Patterson, he saw a black object in her hand at two points: first when Patterson called him over but did not speak to him, and second when he was in the

computer room with Patterson. Additionally, although defendant testified at trial that he thought Patterson may have been holding a gun, no guns were found at the scene.

¶ 37 Furthermore, defendant made numerous statements to witnesses and law enforcement officers prior to and in the course of being detained, and at no point did defendant state that Patterson may have had a gun or that he killed Patterson in self-defense. Instead, defendant stated that he killed Patterson because she threatened to cut off the power to the Acker's singlewide and evict them from the property, or because she "was talking shit about his family and the kids."

¶ 38 Even taking this testimony in the light most favorable to defendant, defendant has failed to establish that he believed it was reasonably necessary to kill Patterson to save himself from death or great bodily harm. Although defendant testified that he was "fearful" when Patterson became angry in her computer room, he also testified that he "would never kill anybody." And although defendant's testimony at trial focused on his fearfulness in Patterson's computer room, none of defendant's statements made prior to trial suggested that defendant was acting in self-defense. Based on defendant's own testimony, it does not appear that defendant had a reasonable ground to believe that killing Patterson was necessary to protect himself.

¶ 39    Accordingly, we hold that defendant failed to establish the first element of self-defense.  Because defendant has failed to establish the first element, it is unnecessary to address the remaining elements.

### 2.    Trial Court's Statements Regarding Defendant's Testimony

¶ 40    Defendant contends the trial court improperly substituted its own assessment of defendant's credibility by characterizing defendant's testimony as "a fantasy" at the charge conference.  We disagree.  Judge Nobles made this statement following defendant's request for a manslaughter instruction at the charge conference, immediately after stating that he did not "see evidence to support a manslaughter instruction in this case."  The trial court's statement was made outside the presence of the jury, and was simply expressing the trial court's reasoning in denying defendant's request.  This statement did not invade the province of the jury and did not have a probable impact on the jury's determination.

### 3.    Prejudice

¶ 41    Assuming defendant had satisfied the first two elements for imperfect self-defense, defendant was also required to show that the failure to instruct the jury on self-defense or manslaughter constituted prejudice and "had a probable impact on the jury's finding that the defendant was guilty."  *See Lawrence*, 365 N.C. at 518, 723 S.E.2d at 334.

¶ 42     Even interpreting the evidence in a light most favorable to defendant, we conclude that the evidence overwhelmingly supports the jury instructions as given. As previously discussed, while defendant testified at trial that he was fearful and thought Patterson may have been holding a gun, defendant made numerous statements prior to trial indicating that he killed Patterson not out of fear, but for other reasons. Furthermore, Patterson did not verbally threaten or physically attack defendant, and the only weapon found at the scene was the bat defendant used to kill Patterson.

¶ 43     Based on the evidence presented to the jury, defendant has failed to show that the trial court's failure to instruct the jury on self-defense or manslaughter constituted prejudice. The evidence of defendant's guilt, most of it from statements he freely and voluntarily made, is overwhelming. Accordingly, we hold that the trial court did not plainly err in declining to instruct the jury on self-defense and manslaughter.

## III.     Conclusion

¶ 44     For the foregoing reasons, we hold that the trial court did not plainly err and that defendant received a fair trial.

NO ERROR.

Judges INMAN and JACKSON concur.